No. 23-30336

# In the United States Court of Appeals for the Fifth Circuit

PLAQUEMINES PARISH,
*Plaintiff - Appellee*

LOUISIANA STATE, EX REL ELIZABETH B. MURRILL; LOUISIANA STATE, THROUGH LOUISIANA DEPARTMENT OF NATURAL RESOURCES, OFFICE OF MANAGEMENT, DUSTIN DAVIDSON, SECRETARY,
*Intervenor Plaintiffs - Appellees*

v.

CHEVRON USA HOLDINGS, INCORPORATED, NAMED AS SUCCESSOR IN INTEREST TO TEXACO E & P, INCORPORATED AND TEXACO, INCORPORATED; CHEVRON USA, INCORPORATED, NAMED AS SUCCESSOR IN INTEREST TO THE CALIFORNIA COMPANY; TEXAS COMPANY; ATLANTIC RICHFIELD COMPANY, NAMED AS SUCCESSOR IN INTEREST TO ARCO OIL AND GAS COMPANY DIVISION OF ATLANTIC RICHFIELD COMPANY,
*Defendants - Appellants*

———————————————

On Appeal from the United States District Court
for the Eastern District of Louisiana
No. 18-CV-5189, Hon. Carl J. Barbier

———————————————

**ORIGINAL BRIEF OF PLAINTIFF-APPELLEE
PLAQUEMINES PARISH**

———————————————

VICTOR L. MARCELLO
ALFRED PAUL LEBLANC, JR.
TALBOT, CARMOUCHE & MARCELLO
17405 Perkins Road
Baton Rouge, LA 70810
Telephone: (225) 400-9991
vmarcello@tcmlawoffice.com

W. PETER CONNICK
CONNICK AND CONNICK
3421 N. CAUSEWAY BLVD., STE. 408
METAIRIE, LA 70002
TELEPHONE: (504) 838-8777

DARREN SUMICH
DAVID A. PARSIOLA
BRANDON J. TAYLOR
COSSICH, SUMICH, PARSIOLA &
TAYLOR, L.L.C.
8397 HIGHWAY 23, SUITE 100
BELLE CHASSE, LA 70037-2648
TELEPHONE: (504) 394-9000

BRUCE D. BURGLASS, JR.
ANDRÉ C. GAUDIN
SCOTT O. GASPARD
BURGLASS & TANKERSLEY, LLC
5213 AIRLINE DRIVE
METAIRIE, LA 70001-5602
TELEPHONE: (504) 836-0407

*COUNSEL FOR PLAINTIFF-APPELLEE*
*PLAQUEMINES PARISH*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### PLAINTIFF-APPELLEE:

Plaquemines Parish

#### COUNSEL FOR PLAINTIFF–APPELLEE:

Donald T. Carmouche, Victor L. Marcello, John H. Carmouche, Brian T. Carmouche, Todd J. Wimberley, D. Adele Owen, Leah C. Poole, Brandon J. Fremin, Christian J. Gremillion, Michael J. D'Albor, Ben Wallace, Emily LaCerte, and Alfred Paul LeBlanc, Jr. with Talbot, Carmouche & Marcello;

Darren Sumich, David A. Parsiola, and Brandon J. Taylor with Cossich, Sumich, Parsiola & Taylor, L.L.C.;

W. Peter Connick with Connick and Connick; and

Bruce D. Burglass, Jr., André C. Gaudin, and Scott O. Gaspard with Burglass & Tankersley, LLC.

### INTERVENOR PLAINTIFFS-APPELLEES:

State of Louisiana, *ex rel.* Liz Murrill, Attorney General; and

State of Louisiana, through the Department of Natural Resources

#### COUNSEL FOR INTERVENOR PLAINTIFFS-APPELLEES:

Jimmy R. Faircloth, Jr. with Faircloth Melton Bash & Green, LLC and David A. Peterson with the Louisiana Department of Justice for the State of Louisiana, ex rel., Liz Murrill, Attorney General; and

Jorge Benjamin Aguinaga with the Louisiana Department of Justice and J. Blake Canfield with the Louisiana Department of Conservation and Energy for the Louisiana Department of Natural Resources

**DEFENDANTS-APPELLANTS:**

Chevron U.S.A. Inc.
Chevron U.S.A. Holdings Inc.
The Texas Company
Atlantic Richfield Company

**COUNSEL FOR DEFENDANTS-APPELLANTS:**

Paul D. Clement, C. Harker Rhodes IV, Joseph J. DeMott, and Ilan J. Posner with Clement & Murphy, PLLC; Jennifer J. Clark, Virginia Seitz, and Kathleen Mueller with Sidley Austin LLP; Steven Paul Lehotsky with Lehotsky Cohn; Michael R. Phillips, Claire Juneau, Charles S. McCowan III, and Pamela R. Mascari with Kean Miller LLP; and Eric J. Mayer and Alexandra White with Susman Godfrey L.L.P. for Chevron U.S.A. Inc., Chevron U.S.A. Holdings Inc., and The Texas Company; and

George Arcenaux III with Liskow & Lewis and Jennifer R. Kwapisz with Arnold & Porter Kaye Scholer LLP for Atlantic Richfield Company

Dated:  July 21, 2026                    */s/ Victor L. Marcello*

*Attorney of Record for Plaintiff-Appellee*
*Plaquemines Parish*

**STATEMENT REGARDING ORAL ARGUMENT**

This Appeal has been set for oral argument on August 5, 2026.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................................. iii

TABLE OF AUTHORITIES ........................................................................................ v

SUMMARY OF ARGUMENT ....................................................................................... 1

ARGUMENT ........................................................................................................... 3

I.  INTRODUCTION ........................................................................................... 3

II. APPELLANTS' "ACTING UNDER" ARGUMENT IS FORECLOSED BY
THE NOTICE OF REMOVAL IN THIS CASE AND THIS COURT'S DECISION
IN *PLAQUEMINES II* ..................................................................................... 4

III. STANDARD OF REVIEW AND BURDEN OF PROOF ..........................................11

IV. THE "ACTING UNDER" ELEMENT ............................................................... 12

V. THE "FOR OR RELATING TO ANY ACT UNDER COLOR OF SUCH OFFICE"
ELEMENT ................................................................................................. 22

VI. DEFENDANTS DO NOT HAVE A COLORABLE FEDERAL DEFENSE THAT
ARISES FROM THEIR OFFICIAL DUTIES ....................................................... 32

    A.  THE COLORABLE FEDERAL DEFENSE REQUIREMENT IS THE SOURCE
OF ARTICLE III JURISDICTION ......................................................... 32

    B.  TEXTUAL ANALYSIS OF COLORABLE FEDERAL DEFENSE ELEMENT .... 33

    C.  THE JURISPRUDENCE UNIFORMLY SUPPORTS THE FOREGOING
TEXTUAL ANALYSIS ....................................................................... 35

    D.  APPELLANTS HAVE NO COLORABLE FEDERAL DEFENSES ................... 42

CONCLUSION ....................................................................................................... 50

CERTIFICATE OF SERVICE .................................................................................... 51

CERTIFICATE OF COMPLIANCE ............................................................................. 52

### TABLE OF AUTHORITIES

**Federal Cases**

*Anderson Living Trust v. ConocoPhillips Company, LLC*, 349 F.R.D. 365 (D. N.M. 2025) ...................................................................................................28

*Arizona v. Manypenny*, 451 U.S. 232 (1981) ..................................................... 34, 36

*Attorney General of State of New Jersey v. Dow Chemical Co.*, 2024 WL 1740087 (D. N. J. April 23, 2024), *aff'd*, 140 F.4th 115 (3d Cir. 2025) ...........................40

*Bank of Louisiana v. Fed. Deposit Ins. Corp.*, 33 F.4th 836 (5th Cir. 2022) ...........8

*BCR Safeguard Holding, LLC v. Morgan Stanley Real Estate Advisor, Inc.*, 614 Fed. Appx. 690 (5th Cir. June 2, 2015) ...................................................................9

*Bd. of Cty. Comm'rs of Boulder v. Suncor Energy (U.S.A.), Inc.*, 25 F.4th 1238 (10th Cir. 2022), *cert. denied*, 143 S.Ct. 1795 (2023)................................... 12, 18

*Bennett v. MIS Corp.,* 607 F.3d 1076 (6th Cir. 2010) ...............................................40

*Blum v. AT&T Corp*, 2025 WL 2792249 (W.D. La. Sept. 12, 2025) .......................43

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) .........................................................44

*Box v. PetroTel, Inc.*, 33 F.4th 195 (5th Cir. 2022) ...................................................9

*Butler v. Coast Elec. Power Assoc.*, 926 F.3d 190 (5th 2019) .................................47

*Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340 (5th Cir. 2024) ........11, 47

*Castro v. O'Neal*, 2020 WL 10051735 (W.D. Tex. Nov. 20, 2020)...........................4

*City & County of Honolulu v. Sunoco LP*, 39 F.4th 1101 (5th Cir. 2022), *cert. denied*, 143 S.Ct. 1795 (2023)................................................................. 13, 39, 42

*City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022), *cert. denied*, 143 S.Ct. 2483 (2023)....................................................................................................12

*City of Oakland v. BP PLCI*, 2023 WL 8179286 (9th Cir. Nov. 27, 2023) (unpublished disposition) ..................................................................................... 20, 21

*Clark v. United States*, 2018 WL 11312978 (E.D. Mo. Aug. 9, 2018) ...................43

*County Bd. of Arlington County v. Express Scripts Pharmacy*, 996 F.3d 253 (4th Cir. 2021) .................................................................................38

*CSWS LLC v. Village of Bedford Park*, 2008 WL 4148530 (N.D. Ill. Aug. 29, 2008) .................................................................................43

*Cty. of San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022), *cert. denied*, 143 S.Ct. 1797 (2023)............................................... 12, 20

*Czerno v. General Elect. Co.*, --- F.4th --- 2026 WL 2030449 (1st Cir. July 14, 2026) .................................................................................18

*Defense Supplies Corp. v. Lawrence Warehouse Co.*, 336 U.S. 361, 69 S.Ct. 762, 93 L.Ed. 931 (1949) .................................................13

*Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310 (9th Cir. 1981) .................................................................................34

*Georgia v. Shafer*, 119 F. 4th 1317 (11th Cir. 2024) .................................................9

*Government of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174 (1st Cir. 2024) .................................................................. 12, 39

*Harmon v. Bayer Business*, 2016 WL 397684 (S.D. Tex. Jan. 29, 2016).................9

*Hinojosa v. Perez*, 214 F.Supp.2d 703 (S.D. Tex. 2002) .........................................7

*Holloway v. Parker*, 784 F.2d 1287 (5th Cir. 1986).................................................44

*Humphries v. Elliot Co.*, 760 F.3d 414 (5th Cir. 2014) ...........................................40

*In re National Prescription Opiate Litig.*, 327 F.Supp.3d 1064 (N.D. Ohio 2018).40

*International Primate Protection League v. Administrators of Tulane Educational Fund*, 500 U.S. 72 (1991) .............................................. 13, 33

*Isaacson v. Dow Chemical Co.*, 517 F.3d 129 (2d Cir. 2008).......................... 34, 37

*Jax Leasing v. Xiulu Ruan*, 359 F.Supp.3d 1129 (S.D. Ala. 2019) .........................32

*Katsigiannis v. M.H. Parsons & Sons Lumber Co., Inc.*, 2025 WL 2778102 (D. N.H. Sept. 26, 2025) .................................................................34

*Kelley v. Abram*, 2017 WL 586360 (D. Minn. Feb. 13, 2017)..................................40

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ...............................................44

*Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) (en banc) passim

*Luster v. Premier Bankcard, LLC*, 2016 WL 7826668 (N.D. Ga. June 7, 2016) ......8

*Martin v. LCMC Health Holdings, Inc.*, 101 F.4th 410 (5th Cir. 2024) ..................11

*Maryland Cas. Co. v. W.R. Grace & Co.*, 1995 WL 562179 (S.D.N.Y. Sept. 20, 1995) ............................................................................26

*Mayor and City Council of Baltimore v. BP, PLC*, 31 F.4th 178 (4th Cir. 2022), *cert. denied*, 43 S.Ct. 1795 (2023) ............................................................12

*Mesa v. California,* 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989)...... passim

*New Hampshire v. Maine,* 532 U.S. 742 (2001)..........................................8

*Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826 (1989) ...............................6

*Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272 (5th Cir. 2005) (en banc) ................8

*Par. of Plaquemines v. Northcoast Oil Co.*, 669 F. Supp. 3d 584 (E.D. La. 2023) ..6

*Par. of Plaquemines v. Riverwood Prod. Co.*, 2022 WL 101401 (E.D. La. Jan. 11, 2022) .................................................................................46

*Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362 (5th Cir. 2023).......................7

*Plaquemines Parish v. BP America Production Co.*, 176 F. 4th 850 (5th Cir. 2026)3

*Plaquemines Parish v. BP America Production Company*, 103 F.4th 324 (5th Cir. 2024) .............................................................................19

*Plaquemines Parish v. Chevron USA, Inc.*, 2022 WL 9914869 (5th Cir. Oct. 17, 2022) (unpublished disposition), cert. denied, 143 S.Ct. 991 (2023) ....................1

*Quinoes v. City of Evanston*, 58 F.3d 275 (7th Cir.1995) ........................................43

*Savoie v. Pennsylvania General Ins. Co.*, 2017 WL 2391264 (E.D. La. 6/2/17) ......5

*Simi Inv. Co., Inc. v. Harris County, Tex.*, 236 F.3d 240 (5th Cir. 2000) .................44

*St. Charles Surg. Hosp., LLC v. La. Health Service & Indem. Co.*, 990 F.3d 447 (5th Cir. 2021)............................................................................22

*St. Charles Surg. Hosp. v. Louisiana Health*, 935 F.3d 352 (5th Cir.2019) 22, 23, 47

*State by Tong v. Exxon Mobil Corporation,* 83 F.4th 122 (2d Cir. 2023)................18

*Stutes v. Gulfport Energy Co.*, 2017 WL 4286846 (W.D. La. June 30, 2017).........45

*Taylor v. Sturgell*, 553 U.S. 880 (2008)......................................................8, 10

*Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017) .......................................................11

*Uintah Ute Indians of Utah v. United States*, 28 Fed. Cl. 768 (1993)......................9

*United States v. Leventhal*, 2024 WL 38581760 (E.D. Wis. Aug. 19, 2024)...........40

*Watson v. Philip Morris Cos.,* 551 U.S. 142 (2007) ...............................................12

*West Virginia ex rel. Hunt v. Caremark PCS Health, LLC*, 140 F.4th 188 (4th Cir. 2025)............................................................................................................39

*Whitmire v. Victus, Ltd.*, 212 F.3d 885 (5th Cir. 2000).............................................5

*Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969) passim

*Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998). passim

*Wood v. Crane Co.*, 764 F.3d 316 (4th Cir. 2014)...............................................5, 6

*Zeringue v. Crane Company*, 846 F.3d 785 (5th Cir. 2017) ............................. 18,19

**Federal Statutes**

1 U.S.C. § 1 ......................................................................................................33

16 U.S.C. § 1456..............................................................................................45

28 U.S.C. § 1442 ....................................................................................... passim

28 U.S.C. § 1653 .............................................................................................4, 5

**Other Authorities**

§ 4416 *Issue Preclusion in General,* 18 Fed. Prac. & Proc. Juris. § 4416 (3d ed.)...8

Carlson and Mayer, *Reverse Preemption*, 40 Ecology L.Q. 583 (2013) .................45

David M. Kennedy, *Freedom from Fear*, *The American People in Depression and War, 1929-1945* (New York: Oxford University Press, 1999)..............................14

*The History of Why Oil Comes in a "Barrel,"* Petroleum Service Company, https://petroleum service company.com/blog/the-history-of-why-oil-comes-in-a-barrel/ (August 19, 2015) ..................................................................................28

William Tidwell & Brendan O'Callaghan, *The Role of the Defense Supplies Corporation in the Wartime Aviation Gasoline Program*. Historical Reports on War Administration: Reconstruction Finance Corporation (1949) ......... 13, 14, 15

## SUMMARY OF ARGUMENT

Appellants' 2018 Notice of Removal stated that their oil and gas exploration and production ("E&P") activities satisfied the "acting under" element of 28 U.S.C. § 1442 ("Section 1442"). Appellants' litigated this theory until it was conclusively rejected by this Court in *Plaquemines Parish v. Chevron USA, Inc.*, 2022 WL 9914869 (5th Cir. Oct. 17, 2022) (unpublished disposition), *cert. denied*, 143 S.Ct. 991 (2023) ("*Plaquemines II*"). Only then did Appellants pivot to their current "avgas refining" theory. The requirement that all grounds for removal be pleaded within the thirty-day removal window, and the doctrine of issue preclusion, bar Appellants' pivot to a new theory five years into this litigation.

Appellants cannot demonstrate that they were "acting under" a federal officer. The contracts that they rely upon do not contain the indicia of Government supervision and control (like detailed product specifications and Government oversight and inspection of manufacturing facilities) that this Court and others have found sufficient to establish the "acting under" element.

Appellants cannot demonstrate that their E&P activities "relate to" avgas refining. Appellants cannot meet their burden of showing that production from the Delacroix Island Field (the conduct at issue in this lawsuit) had an impact upon the refining of avgas.

Appellants' have failed to establish the existence of a colorable federal defense that arises out of the execution of federal law or the performance of federal duties. Their due process and preemption defenses do not arise out of, or even relate to, the performance of any federal duty by the Defense Supplies Corporation, and are in any case not "colorable."

This Court should affirm the judgment below.

## I.    INTRODUCTION

In *Chevron*, the Supreme Court decided "*only whether this suit*, which implicates Chevron's wartime production of crude oil, 'relat[es] to' Chevron's wartime aviation-gasoline refining for the military."[1] It "assumed, without deciding," that Chevron was "acting under" federal officers; did "not resolve whether the defendants in the related cases can satisfy the 'for or relating to' requirement;" and did not "address the other requirements of federal officer removal."[2] It vacated this Court's judgment and remanded "for further proceedings consistent with this opinion."[3] This Court in turn "REMAND[ED] to the respective district courts for proceedings consistent with the Supreme Court opinion."[4]

As shown here, Appellants' lack of a colorable federal defense and principles of issue preclusion are fatal to their removal efforts. In addition, Appellants cannot demonstrate that they "acted under" federal officers, or that the challenged conduct "relates to" any act under color of federal office.

---

[1] *Chevron USA Inc. v. Plaquemines Par., Louisiana*, 146 S. Ct. 1052, 1057 (2026) (hereinafter "*Chevron*") (emphasis added).

[2] *Id.* at n. 2, 5.

[3] *Id*. at 1063.

[4] *See Plaquemines Parish v. BP America Production Co.*, 176 F. 4th 850 (5th Cir. 2026).

**II.  APPELLANTS' "ACTING UNDER" ARGUMENT IS FORECLOSED BY THE NOTICE OF REMOVAL IN THIS CASE AND THIS COURT'S DECISION IN *PLAQUEMINES II*[5]**

The Notice of Removal does not mention any refinery contracts or the performance of such contracts; the terms "refinery" and "avgas" are not even mentioned.[6] The contention that Appellants satisfy the "acting under" requirement of federal officer removal through World War II era refinery contracts was raised for the first time in Appellants' opposition to the motion to remand,[7] filed five years after this case was removed, and only after this Court's decision in *Plaquemines II* foreclosed all grounds for removal set forth in the Notice of Removal.[8]

"A defendant may not remove on grounds not even obliquely referred to in the Notice of Removal."[9] While 28 U.S.C. § 1653 allows a defendant to amend jurisdictional pleadings, in the Notice of Removal context this statute is limited by the fact that all substantive grounds for removal must be stated within the statutory

---

[5]*Plaquemines II* is an unpublished disposition. Under this Court's Rule 47.5.4, unpublished opinions issued on or after January 1, 1996 are binding precedent for purposes of res judicata and collateral estoppel.

[6] ROA.26-69.

[7] ROA 31655, *et seq*.

[8]ROA.31645 *et seq*.; *see* ROA.31449 *et seq*. (*Plaquemines II* opinion). Appellants never attempted to amend their Notice of Removal.

[9] *Castro v. O'Neal*, 2020 WL 10051735, *3 (W.D. Tex. Nov. 20, 2020) (internal quotation marks and citation omitted).

thirty-day removal window. [10] Thus, amendment of a Notice of Removal should be permitted "if it would do nothing more than state an alternative jurisdictional basis for recovery **upon the facts previously alleged**."[11] However, "[w]hile a district court can remedy inadequate jurisdictional allegations, it cannot remedy defective jurisdictional facts."[12]

The Fourth Circuit addressed tardy additions to a Notice of Removal in *Wood v. Crane Co.*, 764 F.3d 316 (4th Cir. 2014). In *Wood*, a defendant crane company removed under Section 1442, claiming that it was "acting under" the Navy in manufacturing and supplying asbestos-containing valves and gaskets. In the Notice of Removal, the defendant asserted it would raise the federal contractor defense in relation to the valves, which were manufactured pursuant to Navy specifications. When the district court severed the valve claims from the gasket claims, the defendant moved to amend its Notice of Removal to also assert the government contractor defense in regard to plaintiff's gasket claims, even though it had earlier maintained that it did not manufacture the gaskets. The district court refused to allow this amendment, and remanded the (severed) gasket claims to state court.

---

[10] *Savoie v. Pennsylvania General Ins. Co.*, 2017 WL 2391264, *3-4 (E.D. La. 6/2/17) (applying 28 U.S.C. § 1653 to supplementation of a Notice of Removal alleging Section 1442 jurisdiction).

[11] *Whitmire v. Victus, Ltd.*, 212 F.3d 885, 888 (5th Cir. 2000) (internal quotation marks and citation omitted).

[12] *Whitmire*, 212 F.3d at 888 (internal quotation marks and citations omitted).

On appeal, the Fourth Circuit observed the applicable rule: "after thirty days, district courts have discretion to permit amendments that correct allegations already present in the notice of removal[, but] Courts have no discretion to permit amendments furnishing new allegations of a jurisdictional basis."[13] The Fourth Circuit concluded the defendant's failure to timely present the federal contractor defense vis-à-vis the gaskets did not concern a mere omitted detail, but rather concerned a substantive ground for removal, and affirmed the remand order.[14]

While the notice of removal in *Wood* at least referenced "valves" and "gaskets," the Notice of Removal in this case addresses exclusively "production," with not a single reference to the refining of avgas. Moreover, here, as in *Wood*, Appellants originally placed all their eggs in the "production" basket, and proceeded, as a strategic matter, to obtain a stay in this and other related cases while that "production" theory was litigated in the *Riverwood* case.[15] In *Riverwood*, the defendants (including Chevron and ConocoPhillips) actually raised the "avgas refining = acting under" theory in the district court, but strategically abandoned that

---

[13] *Wood*, 764 F.3d at 323 (citing *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 831 (1989)).

[14] *Wood*, 764 F.3d at 323-24.

[15] *Par. of Plaquemines v. Northcoast Oil Co.*, 669 F. Supp. 3d 584, 589–90 (E.D. La. 2023) ("*Riverwood* dealt a heavy blow to the defendants, who had been arguing in this district for years (when opposing the plaintiffs' periodic attempts to adjudicate motions to remand in certain of the SLCRMA cases) that *Riverwood* would resolve jurisdictional issues that cut across all of the removed SLCRMA cases.").

theory on appeal, no doubt so they could re-urge it in later appeals (such as the present appeal).[16] It was only after the "production" basis for establishing the "acting under" element was conclusively rejected by this Court in *Plaquemines II* (with the Supreme Court denying certiorari) that Appellants pivoted to the "new" ground of the refining of avgas to establish the "acting under" element.[17] Even if Appellants' raising of that ground in this case, in a pleading filed five years after the Notice of Removal was filed, can be considered a constructive amendment of that Notice, it is clearly a substantive amendment, *i.e.*, an attempt to "remedy **defective jurisdictional facts**," made outside of the thirty-day removal window, and thus an amendment not authorized by law.

"It would be a substantial injustice to allow Appellants to remove a case on one ground and then, when faced with a serious challenge to that ground, attempt to justify removal on an entirely different, and untimely, ground."[18] This "substantial injustice" is further exacerbated by the fact that Appellants' original theory for establishing the "acting under" element was not only "faced with a serious

---

[16] ROA.13861-13890. These documents are part of the record of this appeal. ROA.12387-12388, 31654.

[17] This pivot was made possible by the fact that briefing was stayed in this and other cases pending the outcome of the *Riverwood* case (which was remanded to state court after this Court's decision in *Plaquemines II*). ROA.12387-12388. In a related coastal case reversing a stay pending appeal, this Court observed that "[o]nly when defendants were unsuccessful in *Plaquemines II* did they construct the refinery argument, leading to additional jurisdictional litigation." *Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362, 378 (5th Cir. 2023).

[18] *Hinojosa v. Perez*, 214 F.Supp.2d 703, 707 (S.D. Tex. 2002).

challenge," but defeated on its merits in the *Riverwood* litigation. Consequently, Appellants' present argument is not only an impermissible amendment of its Notice of Removal, **but is also barred by issue preclusion**.

"Preclusion principles . . . bar relitigation of the same jurisdictional *issue* decided in a prior case."[19] "Issue preclusion . . . bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim.'"[20] In determining whether issue preclusion applies, this Court considers whether: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision."[21]

Chevron U.S.A. Inc. was a party to *Plaquemines II*, and Chevron and its privy, The Texas Company, are parties to this appeal.[22] In *Plaquemines II*, the Appellants

---

[19]*Bank of Louisiana v. Fed. Deposit Ins. Corp.*, 33 F.4th 836, 838 (5th Cir. 2022) (emphasis in original) (citations omitted). In *Winters v. Diamond Shamrock Chemical Co.* ("*Winters*"), this Court refused to apply issue preclusion to a determination of federal officer jurisdiction on grounds that collateral estoppel may not be applied offensively to a jurisdictional decision that is not capable of being subjected to review. 149 F.3d 387, 392 (5th Cir. 1998), *overruled on other grounds by Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020) (en banc) ("*Latiolais*"). However, this impediment to the application of issue preclusion was eliminated by the 2011 amendments to Section 1442, as evidenced by the instant appeal.

[20]*Taylor v. Sturgell*, 553 U.S. 880, 892 (2008), quoting *New Hampshire v. Maine,* 532 U.S. 742, 748-749 (2001).

[21]*Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005) (en banc); *see also* § 4416 *Issue Preclusion in General,* 18 Fed. Prac. & Proc. Juris. § 4416 (3d ed.).

[22] Chevron and The Texas Company are united by common ownership and a common interest in both cases (in which they are represented by some of the same attorneys) sufficient to demonstrate privity. Doc. No. 204, p. 8; *Luster v. Premier Bankcard, LLC*, 2016 WL 7826668, *5-6 (N.D. Ga. June 7, 2016) (listing cases). The Texas Company is the only defendant in this case

alleged, as in the Notice of Removal in this case, that they "acted under" federal officers in producing crude oil during WWII. This Court held that "[t]here is no removal jurisdiction in this case because Producers did not 'act pursuant to a federal officer's or agency's directions.'"[23] Thus, the question of whether Appellants were "acting under" federal officers was actually litigated and necessary to the decision in *Plaquemines II*, and is identical to the question presented here.

Issue preclusion is broad enough to embrace Appellants' current pivot to its new "acting under" argument. Issue preclusion bars relitigation of an "issue" previously decided, not just the particular arguments made in regard to that "issue,"[24] and "thus forecloses [Appellants] from relitigating the same issues that it could, or should, have framed more broadly."[25] Indeed, as discussed *supra,* Appellants

that Appellants contend was a "person" "acting under" a federal officer, and thus the only party able to effect a removal under Section 1442. *See Georgia v. Shafer*, 119 F. 4th 1317, 1320 (11th Cir. 2024).

[23] 2022 WL 9914869, at *2 (brackets omitted) (quoting *Box v. PetroTel, Inc.*, 33 F.4th 195, 199 (5th Cir. 2022)).

[24] *See BCR Safeguard Holding, LLC v. Morgan Stanley Real Estate Advisor, Inc.*, 614 Fed. Appx. 690, 701 (5th Cir. June 2, 2015) ("That Appellants are now seeking recovery on different (non-contractual) legal theories is inapposite, as collateral estoppel precludes relitigation of issues in a subsequent suit concerning a **different claim or cause of action**.") (emphasis in original) (internal brackets, ellipses, quotation marks, and citation omitted); *Harmon v. Bayer Business*, 2016 WL 397684, *7 (S.D. Tex. Jan. 29, 2016) ("Plaintiffs contend that the issues in the two actions are different because their arguments in this action are focused on Bayer's actions while their arguments in the previous action were focused on the actions of other plan administrators and fiduciaries. But under the doctrine of collateral estoppel reliance on different arguments does not require relitigation of identical issues.") (citation omitted).

[25] *Uintah Ute Indians of Utah v. United States*, 28 Fed. Cl. 768, 781 (1993) (brackets supplied).

actually argued in *Riverwood* that the "acting under" element could be satisfied by refiners' avgas contracts, but inexplicably failed to press this issue on appeal.[26] Because Appellants had a "full and fair opportunity to litigate" the "issue" of whether they satisfy the "acting under" requirement of Section 1442(a), and lost on that issue in *Plaquemines II*, they are precluded from relitigating that "issue" in this proceeding.[27]

The bottom line is that Appellants should not be permitted to set forth Ground A for removal in their Notice of Removal; litigate fully the issue of Ground A, against the same parties, until a preclusive determination is made; and then pivot to a previously un-pleaded Ground B. Such a practice effects a "substantial injustice" on Appellees. This Court should reject Appellants' untimely and precluded "avgas refining" argument and affirm the remand order.

---

[26] *See* Note 17, *supra*.

[27] *Taylor*, 553 U.S. at 892.

**III. STANDARD OF REVIEW AND BURDEN OF PROOF**

This Court reviews *de novo* a district court's order remanding a case removed pursuant to Section 1442.[28] Any factual findings made by the District Court which underlie the remand order are reviewed only for clear error.[29]

Even in the context of a Section 1442 removal, "when faced with a motion to remand, the defendant has the burden of establishing the existence of federal jurisdiction over the controversy by a preponderance of the evidence."[30] Thus, Appellants have the burden of proving each of the following by a preponderance of the evidence:

> First, the removing defendant must be the United States, a federal agency, a federal officer, or a person "acting under" a federal officer, such as certain private parties hired to assist federal officers. Second, the suit must be "for or relating to any act under color of such office." Third, the removing defendant must assert "a colorable federal defense."[31]

---

[28] *Martin v. LCMC Health Holdings, Inc.*, 101 F.4th 410, 414 (5th Cir. 2024).

[29] *Texas v. Kleinert*, 855 F.3d 305, 311 (5th Cir. 2017).

[30] *Winters*, 149 F.3d at 397; *see Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 346 (5th Cir. 2024) ("Though the defendant maintains the burden to establish the existence of jurisdiction, we review the district court's order without a thumb on the remand side of the scale.").

[31]*Chevron,* 146 S. Ct. 1052, 1057.

## IV. THE "ACTING UNDER" ELEMENT[32]

A private person does not "act under" a federal officer when it enters into an ordinary commercial transaction to sell the Government products, even where the Government purchases copious amounts of the product in question to fulfill a pressing need.[33] In such cases the private person is acting only in its private capacity as a maker of commercial products for sale at a profit.[34] Contracts to supply products to the Government satisfy the "acting under" element only when the contractor's "relationship with the government 'is an unusually close one involving detailed regulation, monitoring, or supervision.'"[35] As pertinent to this case, "a private party

---

[32] It bears repeating that the Supreme Court's decision in *Chevron* and this Court's *en banc* decision in *Latiolais* do not address, much less disturb, prior precedent regarding the "acting under" element of the Section 1442 removal test. *Chevron*, 146 S.Ct. at 1062, n. 5 ("We do not resolve whether the defendants in the related cases can satisfy the 'for or relating to' requirement. We also do not address the other requirements of federal officer removal."); *Latiolais*, 951 F.3d at 291 (isolating "connection prong" as the "focal point of dispute").

[33] *See, e.g., City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 712-13 (3d Cir. 2022), *cert. denied*, 143 S.Ct. 2483 (2023); *Cty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 757-59 (9th Cir. 2022), *cert. denied*, 143 S.Ct. 1797 (2023); *Mayor and City Council of Baltimore v. BP, PLC*, 31 F.4th 178, 230-31 (4th Cir. 2022), *cert. denied*, 43 S.Ct. 1795 (2023); *Bd. of Cty. Comm'rs of Boulder v. Suncor Energy (U.S.A.), Inc.*, 25 F.4th 1238, 1253-54 (10th Cir. 2022), *cert. denied*, 143 S.Ct. 1795 (2023).

[34] *Id.*.

[35] *Government of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 193 (1st Cir. 2024) (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 153 (2007)). *Watson* cited with approval this Court's decision in *Winters*, which held that a government contractor satisfied the "acting under" requirement of Section 1442 because the contractor was acting on behalf of the government to produce Agent Orange, a carcinogenic herbicide used as part of the war strategy in Vietnam, and was acting under the close direction of the federal government which had provided "detailed specifications concerning the make-up, packaging, and delivery of Agent Orange," as well as "on-going supervision . . . over the formulation, packaging, and delivery of Agent Orange." 149 F.3d at 399–400

acts under the government when the party is a contractor *given detailed specifications and ongoing supervision* to help fight a war."[36]

Appellants presented in the district court several contracts between the Defense Supplies Corporation ("DSC"), and Appellant The Texas Company, for the refining of aviation fuel (avgas) at The Texas Company's Port Arthur facility (the "Avgas Contracts").[37] These contracts do ***not*** exhibit the necessary supervision or control necessary to satisfy the "acting under" requirement.

The DSC, the putative "federal officer" in this case,[38] was a wholly-owned subsidiary of the Reconstruction Finance Corporation ("RFC").[39] The DSC was established to address a specific problem: the unwillingness of private capital to finance the expansion of refining facilities to meet one-year supply contracts (the maximum term to which the military was at that time able to commit) for military fuels like avgas.[40] The solution to this problem was twofold: the RFC's incorporation

---

[36] *City & County of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1107 (9th Cir. 2022) (emphasis supplied) (citations omitted), *cert. denied*, 143 S.Ct. 1795 (2023).

[37] ROA.32119-136, 34270-34304.

[38] Appellants' *implicit* contention is that a "public corporation" like the DSC is not a "federal agency," but rather a distinct corporate "person," and thus can be a "federal officer," *International Primate Protection League v. Administrators of Tulane Educational Fund*, 500 U.S. 72, 79-82 (1991) (term "federal officer" does not include any "federal agency"). The State will address this issue in its briefing. The Parish observes that the identification of a "federal officer" under which The Texas Company was "acting" is part of Appellants' burden of proof.

[39] The DSC was incorporated in 1940 and dissolved in 1946. *Defense Supplies Corp. v. Lawrence Warehouse Co.*, 336 U.S. 361, 363 (1949).

[40]ROA.28924-28925(declaration of Jay L. Brigham, Ph.D. ("Brigham Declaration"), ¶¶ 34-35); ROA.29445-56 (excerpt from William Tidwell & Brendan O'Callaghan, *The Role of the*

of the DSC, whose purpose was to enter into multi-year supply contracts with refiners to purchase needed products (like avgas) for resale to the military; and the RFC's complementary creation of a program to finance such plant expansions through commercial loans made on favorable terms.[41]

> In other words, the RFC offered (1) to make purchase commitments for longer periods than the Services could make, thereby justifying the investment of private capital in new facilities, and (2) to build or finance the construction of new facilities. It was the use of these two devices that enabled the great expansion of productive facilities during the war.[42]

The Government also provided refiners with a second option, namely the construction of adjunct Government production facilities under funding and direction provided by the Defense Plant Corporation ("DPC").[43] However, most refiners, like the Texas Company in this case, opted for the RSC supply contract/RFC

---

*Defense Supplies Corporation in the Wartime Aviation Gasoline Program*. Historical Reports on War Administration: Reconstruction Finance Corporation (1949), attached as an exhibit to the Brigham Declaration). The Brigham Declaration and its attachments were from the *Riverwood* litigation, made part of the record in this case, and expressly relied upon by the Parish in its motion to remand in this case, *see* ROA.12387-12388, 31474, 31654

[41] *Id.*

[42] ROA.29448 (Tidwell & O'Callaghan, p. 12). As historian David Kennedy has observed, "[w]hen tax-advantaged private capital was not forthcoming, the [RFC] stood ready to provide government loans for needed plant expansion. As a further emolument, Roosevelt ordered the Justice Department to relax antitrust prosecutions." ROA.28918-28919 (Brigham Affidavit, ¶ 20); ROA.28979 (David M. Kennedy, *Freedom from Fear*, *The American People in Depression and War, 1929-1945*, p. 623 (New York: Oxford University Press, 1999) (attached as an exhibit to the original Brigham Declaration). This book won the Pulitzer Prize for history in 2000. ROA.28915.

[43] ROA.29445-56 (Tidwell & O'Callaghan).

loan option, **precisely because they wanted to avoid Government control or supervisions of the construction or operation of their facilities**:

> Most of the large oil companies engaged in the aviation gasoline program preferred not to use the DPC mechanism. Having long-term purchase commitments from the Government and other incentives, the companies preferred to erect new facilities as private rather than public ventures. Further, the vast majority of new facilities built were additions to existing refineries, rather than complete new refineries. The companies did not like the idea of intermingling their own facilities with Government-owned installations.[44]

The Avgas Contracts at issue in *this* case are DSC contracts, and as the foregoing suggests, contain none of the hallmarks of Government control or supervision typically present when a Government contractor "acts under" a federal officer. While Appellants state in brief that the Avgas Contracts provided "detailed specifications set by the federal government," Appellants' cite nothing in the record to substantiate this assertion.[45] While the Avgas Contracts recite that the Government is obligated to buy 5,900 barrels per day "in accordance with the alternate specifications set forth in Exhibit A attached hereto," Exhibit A is only a one-page price list reflecting the price the DSC will pay for the listed grades of avgas.[46]

---

[44] ROA.29450 (Tidwell & O'Callaghan, p. 14).

[45] *See* Doc. 204, pp. 36, 51 (citing ROA.31665 and ROA.36332-33). The record citations in support of this representation (ROA.31665 and ROA.36332-33) consist of a citation to a page of one of Appellants' memoranda in the District Court(ROA.31665), and a portion of the District Court's remand order which describes (but does not accept) Appellants' contentions in the District Court (ROA.36332-33). No **evidence** is cited to support Appellants' representation.

[46] ROA. 32136; *see* ROA 32120-32136 (initial contract); 34271-34304 (amendments); *see also* ROA.29863-73 (expert affidavit of Charles Norman, from *Riverwood* litigation, made part of the record in this case, and expressly relied upon by the Parish in its motion to remand, *see*

Likewise, the Avgas Contracts lack any provision allowing Government employees to monitor or participate in refinery operations; the only provision in the Avgas Contracts for "inspections" involve inspections of the quality and quantity of avgas delivered for sale, *i.e.*, inspections of the final product **after** all refining is complete.[47] This lack of any Government role extends to disputes that may arise under the Avgas Contracts, which are to be decided by private arbitrators unaffiliated with either the Texas Company or the Government.[48]

These terms are what one would expect of a contract to sell avgas to the DSC, an intermediary between private industry and the military whose sole purpose is to provide an output purchase obligation of sufficient length to encourage the ***voluntary*** investment of ***private*** capital.[49] The same is true of the contractual provisions reflecting the RFC's loan commitment, which address the same sort of commercial

---

ROA.12387-12388, 31472, 31654). While the Avgas Contracts also provide for "other specification which my mutual agreement shall be attached as an addendum to Exhibit A," there is no evidence of any addendum which provided any requirements regarding the refining process, the equipment to be used, or the conduct of refining operations. *Id*.

[47] ROA.32129-32130, 34277-34278, 34294-34295. The contracts do not require Government inspectors, but rather only the issuance of a "certificate of inspection" by an "available" and "licensed inspector" whose inspection "conform[s] with usual industry practice." *Id*. In other words, the inspection regime called for by the Avgas Contracts was the same as every other commercial purchaser of refinery output. This is unsurprising; "contemporary commentators and participants in the wartime programs are virtually unanimous that the relationship was cooperative, **and that the government left the production details largely to the industry**." ROA.28916 (Brigham Declaration, ¶ 15) (emphasis supplied).

[48] *Id*.

[49] As Appellants' own evidence shows, "[t]he DSC was a government corporation organized in August 1940 as a subsidiary of the RFC to finance plant expansion and purchase 100-octane aviation gasoline." ROA.31692 (n. 7); *see* ROA.31806-31816.

loan transaction (at favorable terms) that federal agencies participate in on a daily basis.[50]

More to the point, these are **not** the sort of contracts that this Court has found establish the "acting under" element. In *Winters*, for example, this Court found that the defendants' evidence showed that the Government controlled the manufacturing and distribution process through its detailed contractual specifications:

> Each was required to produce and provide to the Department of Defense the herbicidal mixture known as "Agent Orange"—with the specifications for the defoliant (and its packaging) specifically dictated by the government. Although the defendants had produced 2,4–D and 2,4,5–T for commercial use before government involvement, their commercial formulations were never composed of a mixture of 100% pure 2,4–D/ 2,4,5–T, which the government required for the most part (98% for 2,4–D and 99% for 2,4,5–T) in its contracts with the defendants. Instead, the defendants had always included a substantial percentage of inert ingredients to dilute the two active ingredients and required further dilution before commercial application. In contrast, the government's specifications for Agent Orange included use of the two active chemicals in unprecedented quantities for the specific purpose of stripping certain areas of Vietnam of their vegetation. To quickly achieve this goal, the government dictated that Agent Orange contain only the active ingredients 2,4–D and 2,4,5–T and it applied the product in Vietnam without dilution.[51]

---

[50] Pursuant to the initial Avgas Contract, RFC loaned The Texas Company $5 million to finance the initial expansion. ROA.32121, ROA.32127-32128; *see* 103 F.4th at 337. An additional expansion of The Texas Company's Port Arthur facility was financed by the RFC in March of 1942, and at that time the RFC loaned The Texas Company an additional $16.125 million. ROA.3427-34304. The Texas Company, for its part, presumably enjoyed the benefits of its expanded production facilities (which under the Avgas Contracts it alone owned and controlled) long after World War II ended and the DSC had ceased to exist. This was, of course, the benefit of accepting the DSC contract option, as opposed to the Government-controlled DPC option.

[51] *Winters*, 149 F.3d at 399.

Likewise, in *Zeringue v. Crane Company*, this Court found a similar showing of control and supervision was made by contract documents and affidavits showing that equipment manufactured for sale to the Navy was constructed in accordance with specifications so detailed that they regulated the raw materials used in the manufacturing process.[52] Furthermore, in both *Zeringue* and *Winters* the contracts provided for inspections, performed by Government inspectors, to ensure the detailed contractual specifications were being followed.[53] Here, Appellants' make no showing that the Avgas Contracts are anything other than contracts to supply the military with a product needed for the war effort. Such contracts lack sufficient indicia of control and supervision to satisfy the "acting under" element.[54]

---

[52] 846 F.3d 785, 792 (5th Cir. 2017), *overruled on other grounds by Latiolais*, 951 F.3d at 296.

[53] 846 F.3d at 788; 149 F.3d at 399, 401 n. 14.

[54] *Zeringue*, 846 F.3d at 792; *Winters*, 149 F.3d at 399; *accord, Czerno v. General Elect. Co.*, --- F.4th --- 2026 WL 2030449, *6 (1st Cir. July 14, 2026) ("acting under" prong satisfied where "Several exhibits in the record demonstrate a high level of detail and specification in the government's demands from GE."); *State by Tong v. Exxon Mobil Corporation,* 83 F.4th 122, 144 (2d Cir. 2023) ("But the mere fact that Exxon Mobil helps the government to produce an item that it needs is not enough; it must also show that in providing fossil fuels to the military it acts under the close supervision, subjection, guidance, or control of federal officers.") (internal quotation marks, and citations omitted); *Bd. of Cty. Comm'rs of Boulder*, 25 F.4th at 1253 ("The government can (and does) purchase some of the fuel produced by Exxon via its OCS leases, as it does from others in the marketplace. But the OCS leases do not require Exxon to tailor fuel production to detailed government specifications aimed at satisfying pressing federal needs.") (citations omitted).

Appellants rely entirely upon panel decision in *Plaquemines Parish v. BP America Production Company*, 103 F.4th 324 (5th Cir. 2024), *vacated by Chevron*, to satisfy their evidentiary burden.[55] However, that decision has been vacated.

There are other reasons why this Court should not be swayed by that panel's decision. The panel in the vacated decision considered not only the Avgas Contracts, but also other avgas contracts (the "Other Contracts") not relevant to this case.[56] While the vacated decision discussed with approval the *Winters* decision, it failed to consider whether the Avgas Contracts (as opposed to the Other Contracts) contained the sort of detailed manufacturing specifications this Court found dispositive in *Winters* and *Zeringue* (they do not).[57] Moreover, the vacated decision rested in large part upon the conclusion that "the terms of Defendants' federal contracts vested the government with control over the size and manufacturing capacity of their refineries."[58] While this conclusion may be correct as to DPC contracts, it is not an accurate characterization of the terms of the DSC contracts at issue here. The Avgas Contracts express only that The Texas Company is "willing" to *voluntarily* expand

---

[55] Doc. 204, at 51-53.

[56] *See* 103 F.4th at 337-38.

[57] 103 F.4th at 334-35. This Court did observe that the contract stated that the product should be produced "in accordance with" specifications attached to the contract or provided by addendum, but failed to observe that *the record contained no such specifications*, with the only "specifications" attached to the Avgas Contracts being a price list. *See* ROA.32136.

[58] 103 F.4th at 335.

its facilities to enable the manufacture of larger volumes of avgas *if* the RFC lends it the money to finance this expansion. Nothing in the plain text of the Avgas Contracts gives the Government any "control" over the planning or execution of this expansion; rather, as was customary with DSC contracts, such "control" remained entirely in the hands of private industry.[59] Whatever provisions the Other Contracts may have contained, a review of the Avgas Contracts reveals nothing more than straightforward commercial supply and loan transactions.

This conclusion is supported by the Ninth Circuit's decision in *City of Oakland v. BP PLCI*.[60] In *City of Oakland*, the Ninth Circuit considered whether certain energy companies (including some of Appellants herein) "were acting under federal direction during World War II and pursuant to ongoing specialized fuel contracts." The Ninth Circuit, relying upon its prior holdings in *Cty. of San Mateo* *("San Mateo III*),[61] concluded that those contracts lacked sufficient indicia of Government direction and control to establish the "acting under" element:

> As to the World War II claims, the evidence supplied by the Energy Companies merely confirms their compliance with the law while executing arms-length business agreements to supply fuel and build fuel infrastructure. *San Mateo III*, 32 F.4th at 758 ("compliance" with regulation in the course of an "arm's length business relationship"

---

[59] *See* ROA.32119-136, 34270-34304.

[60] 2023 WL 8179286 (9th Cir. Nov. 27, 2023) (unpublished disposition). Under Ninth Circuit Rule 36-3, and in accordance with Federal Rule of Appellate Procedure 32.1, citation to this unpublished disposition is permitted.

[61] *See* Note 33, *supra*.

insufficient to remove action). Turning to the specialized fuel contracts, *San Mateo III* does not restrict its holding to "widely available commercial products," rather "widely available commercial products" are just one type of relationship that does not evince an "acting under" relationship. *Id*. In the same sentence, the *San Mateo III* court holds that "arm's-length business arrangement[s]" too fail to support an "acting under" relationship." *Id*. at 757. Simply put, the specialized fuel contracts here are no more than "arms-length business agreement[s]," and accordingly, the Energy Companies were not "acting under" federal officers.[62]

Appellants' brief pays short shrift to this issue; cites nothing in the record to support the conclusion that Appellants have satisfied their evidentiary burden; and assumes this Court's willingness to abdicate its duty to review the record in this case. When this Court looks at the evidence of record (beginning with the Avgas Contracts themselves), it will agree that the Avgas Contracts constitute only "arms-length business agreements" to supply products and borrow money, but grant no control or supervision of the refining process to the Government. Appellants' have failed to prove that they "acted under" a "federal officer" in performing the Avgas Contracts.

---

[62] *City of Oakland*, 2023 WL 8179286, *2 (internal brackets, quotation marks, and citations in original).

## V. THE "FOR OR RELATING TO ANY ACT UNDER COLOR OF SUCH OFFICE" ELEMENT

Assuming *arguendo* (as did the Supreme Court in *Chevron*) that The Texas Company was "acting under" a "federal officer," the question remains what "acts" of the Texas Company qualify as "acts under color of such office." An answer to this question is required in order to evaluate the second element of federal officer removal, *i.e.*, whether this lawsuit is "for or relating to any act under color of" the DSC.

As this Court has recognized, a company that "acts under" a "federal officer" pursuant to a contractual line of business does not "act under" the direction of that federal officer for **all** purposes.[63] In *St. Charles Surgical Hosp.*, this Court considered a lawsuit challenging hundreds of insurance claims made against an insurer (Blue Cross/Blue Shield, or "BCBS"). Discovery responses indicated that a handful of the claims at issue might concern insurance claims by federal employees under a BCBS-administered program managed by the Office of Personnel Management ("OPM"). As this Court observed, federal officer removal jurisdiction in *St. Charles* hinged upon whether the lawsuit was related to a directive from OPM (the "federal officer"); any relationship between the lawsuit and claims as to which BCBS was not "acting

---

[63] *See St. Charles Surg. Hosp., LLC v. La. Health Service & Indem. Co.*, 990 F.3d 447, 455 (5th Cir. 2021).

under" OPM could not justify removal.[64] As this Court further observed, "even if BCBS is determined to have been acting under OPM in this case, it is possible that the alleged conduct underlying St. Charles's fraud and abuse-of-right claims was not connected or associated with (or related to) any federal directive ***from OPM***."[65]

Appellants point only to the Avgas Contracts to establish the "acting under" element.[66] Nonetheless, in brief Appellants' repeatedly represent that "most" of the crude oil produced in the field at issue in this case (the Delacroix Island Field) was, after being transported to Port Arthur refinery, "refined into avgas **and other wartime petroleum products** under contracts with the federal government."[67] Because Appellants premise their satisfaction of the "acting under" element solely upon the Avgas Contracts (pursuant to which they contend they were "acting under" the DSC), the only relevant part of this statement is the assertion that the crude oil produced from the Delacroix Island Field was "refined into avgas." Conversely, if the evidence shows only that crude oil produced in the Delacroix Island Field was

---

[64] *St. Charles Surgical Hosp.*, 990 F.3d at 455 ("If the district court concludes that St. Charles's waivers are valid, then there may be little room to contend that BCBS 'acted under' OPM in administering non-federal health insurance payments. And the same may be true if, irrespective of the waivers, the court concludes that St. Charles's complaint does not include any federally-governed claims, because the discovery disclosures to the contrary were inadvertent, or otherwise.").

[65] *Id.*

[66] Doc. 204, p. 51-53.

[67] Doc. 204, p. 29 (citing ROA.31742) (emphasis supplied).

"refined into . . . other wartime petroleum products,"[68] or into products destined for civilian use,[69] Appellants have failed to prove that the crude oil production "relates to acts under color of" the DSC. In other words, evidence that merely establishes a relationship between this lawsuit and The Texas Company's general refining operations, but not the refining of avgas specifically, will not satisfy the second element of federal officer removal.

*Chevron* supplies the template for application of the second element of the Section 1442 removal inquiry. The relationship the court discerned in *Chevron* arose from the fact that "much of the crude oil" that the Texas Company produced from a specific field (the Delta Duck Club Field) "was ultimately used for its own avgas refining."[70] As the *Chevron* court stated it, this crude oil was "essential feedstock" for the Texas Company's contemporaneous refining operation, and thus anything that impacted the ability of the Texas Company to produce this "essential feedstock"

---

[68] While Appellants' repeatedly reference the profusion of military procurement contracts during World War II, Appellants make no showing of Government supervision and control as to any such procurement contract, other than the Avgas Contracts. *See, e.g.,* ROA.34243-34245 (random listing of war supply contracts).

[69] Although the military's use of petroleum products greatly increased during World War II, more than 70% of petroleum products produced during the war were sold on the civilian market. ROA.28942 (Brigham Declaration, ¶ 84) (citing November 4, 1943 *Oil and Gas Journal*).

[70] *Chevron,* 146 S.Ct. 1052, 1061.

(such as the operational standards inherent in the Parish's coastal permit claims) also impacted the ability of the Texas Company to refine avgas.[71]

Appellants posit that they can satisfy the "related to" inquiry by showing that The Texas Company "used large quantities of crude oil that it produced in the Delacroix Island Field to fulfill its wartime avgas contracts with the federal government."[72] Appellants cite two record pages in support of their contention, ROA.31741 and 31742. These are pages from the affidavit of Alfred M. Gravel, a consultant hired by Appellants to recite the contents of World War II era documents. These pages relate the following facts pertinent to this appeal:

- The Texas Company produced hundreds of thousands of barrels of crude oil in the Delacroix Island Field;

- Much, if not all, of this crude oil was transported to The Texas Company's Port Arthur refinery; and

- This refinery produced a significant amount of "war products," including avgas.[73]

Putting to one side Mr. Gravel's arbitrary selection of authorities for the "facts" he states,[74] these facts alone do not establish that "large quantities of crude

---

[71] *Chevron*, 146 S.Ct. at 1061 ("If Chevron had refrained from these actions and produced less crude oil as a result, its avgas refining for the military may have suffered.").

[72] Doc. 204, p. 29 (citing ROA.31742).

[73] ROA.31741-31742.

[74] For example, Mr. Gravel states that production in the Delacroix Island Field in 1942 amounted to 52,500 barrels. ROA.31741. Mr. Gravel retrieved this figure from an oil industry periodical published in early 1943. *Id*.; *see* ROA.33895. However, the actual production cards filled out by The Texas Company and filed with state regulators recite only 40,512 barrels of crude

oil produced in the Delacroix Island Field" (as opposed to crude oil produced elsewhere) were used "to fulfill" The Texas Company's "wartime avgas contracts with the federal government." Moreover, the wider record refutes this assertion.

To begin with, the only detailed information in this record regarding The Texas Company's Port Arthur operations consists of crude oil usage and refining cost and output data from the first three quarters of 1942, and a single-page "run sheet" showing average daily deliveries of crude oil during February of 1944.[75] The 1942 data reflects that the Port Arthur facility consumed 16,676 barrels from the Delacroix Island Field during the first quarter of 1942.[76] This might seem an impressive number, until one recognizes that the facility's refining operations consumed a total of 11,791,550 barrels of crude oil during the same period.[77] In other words, in the first quarter of 1942, Delacroix Island Field production accounted for only roughly 0.15% of the crude oil refined at The Texas Company's Port Arthur facility.[78] These figures worsen as 1942 progresses, with crude oil produced in the

---

oil produced in the Delacroix Island Field in 1942. ROA.34759. Mr. Gravel, who provided both sets of documents, fails to explain, much less acknowledge, this 11,988 barrel inconsistency.

[75] ROA.34043-34082; ROA.34241. The Parish does not assert that the piecemeal and incomplete factual palette presented by Appellants was the result of anything other than the passage of time. "The passage of time, however, does not lessen [Appellants'] burden." *Maryland Cas. Co. v. W.R. Grace & Co.*, 1995 WL 562179, *7 (S.D.N.Y. Sept. 20, 1995) (brackets supplied).

[76] ROA.34049.

[77] ROA.34050.

[78] This data includes production at the neighboring Port Neches facility owned and operated by The Texas Company. The production at Port Neches was a small portion of that at Port Arthur, and moreover transfer of crude oil from Port Neches to Port Arthur were commonplace, and

Delacroix Island Field accounting for less than 0.03% of the crude oil consumed by The Texas Company's facility in the second quarter of 1942,[79] and only 0.09% of total consumption in the third quarter of 1942.[80]

This paltry performance may be explained by the fact that the Delacroix Island Field had only one oil-producing well during 1942, the only year for which Appellants produced refinery figures.[81] But nothing in the record supports an inference that the relative participation of the Delacroix Island Field in The Texas Company's refining operation dramatically improved in the following years. To the contrary, the February 1944 run sheet shows only 461 barrels per day being received from the Delacroix Island Field, out of a total of 61,140 barrels total, or 0.75%.[82] A slight improvement from 1942, but still merely a drop in the bucket.

As *Chevron* indicates, the "relating to" element is not satisfied by a connection that is "tenuous, remote, or peripheral."[83] If all, or even most, of The Texas Company's **output** at Port Arthur had consisted of avgas, the question would be

---

amounted to nearly a million barrels in the first quarter of 1942 alone. ROA.34050. These records were submitted by Appellants, who alone controlled their submission and presentation.

[79] 2,940 barrels produced in the Delacroix Island Field consumed at the Port Arthur refinery, out of a total of 9,560,566 barrels consumed. ROA.34062-34063.

[80] 9,910 barrels produced in the Delacroix Island Field consumed at the Port Arthur refinery, out of a total of 10,639,287 barrels consumed. ROA.34076-34077.

[81] ROA.33895; ROA.34759.

[82] ROA.34241.

[83] 146 S.Ct. at 1061.

whether such a *de minimis* a contribution to the refining had any meaningful impact

the refinery's avgas production. But there is more relevant evidence to consider.

The same evidence of refinery operations shows that, in the first quarter of

1942, the Port Arthur facility produced 520,425,738 gallons of various petroleum

products, including gasolines, napthas, distillates, residual fuel oils, *etc*.[84] During

this same time period the Port Arthur facility produced only 384,000 barrels,[85] or

16,128,000 gallons,[86] of avgas. In other words, in the first quarter of 1942, only 3%

of the Port Arthur facility's refining output was avgas. In the second quarter of 1942

the percentage of avgas production out of total refinery production increased to

4.3%, or 445,000 barrels[87] (19,110,000 gallons) of avgas out of 440,982,822 gallons

---

[84] ROA.34053.

[85] ROA.31832. This total was calculated by adding the monthly avgas production figures, as reported by the Government, for the Port Aruthur facility from January through March of 1942.

[86] Conversion of barrels to gallons in this brief is accomplished by multiplying the number of barrels by 42, as 1 barrel = 42 gallons was at all pertinent times the industry standard conversion ratio in the petroleum industry. "The industry standard for 1 barrel is 42 gallons, as opposed to the average industrial-sized barrel's 55-gallon capacity, because in 1872, the Petroleum Producers Association, the US Geological Survey, and the US Bureau of Mines all adopted the 42-gallon drum as their standard." *Anderson Living Trust v. ConocoPhillips Company, LLC*, 349 F.R.D. 365, 397 n. 17 (D. N.M. 2025) (citing *The History of Why Oil Comes in a "Barrel,"* Petroleum Service Company, https://petroleum service company.com/blog/the-history-of-why-oil-comes-in-a-barrel/ (August 19, 2015)). The contracts at issue in this case define one barrel of avgas as equaling 42 gallons. ROA.32123; ROA.34286.

[87] ROA.31832. This total was calculated by adding the monthly avgas production figures for the Port Aruthur facility from April through June of 1942.

total production.[88] In the third quarter, this ratio dipped to 3.6%, or 429,000 barrels[89] (18,018,000 gallons) of avgas out of 497,618,016 gallons total production.[90]

Completely missing from this comprehensive production and refining data is any indication that crude oil produced in the Delacroix Island Field was used in the manufacture of avgas (as opposed to other petroleum products). The only record evidence which Mr. Gravel points to that purports to establish such linkage is a letter, dated September 16, 1942, from an officer of The Texas Company to a federal official.[91] The author of the letter seeks to continue the receipt by The Texas Company's refineries at Port Arthur and Port Neches of, *inter alia*, 4,068 barrels per day from the "Garden Island-Delacroix-Delta Duck" Fields and 1,450 barrels per day from the Golden Meadow B Field.[92] The letter recites that The Texas Company uses production from these four fields to refine avgas, "solvent refined motor oils," and "high viscosity wax distillates."[93] This letter does not specify which of the four named fields' production is used to refine which petroleum product. However, the evidence of record indicates that, while the three other fields referred to (the Garden

---

[88] ROA.34066.

[89] ROA.31832. This total was calculated by adding the monthly avgas production figures for the Port Aruthur facility from July through September of 1942.

[90] ROA.34080.

[91] ROA.34084-34088.

[92] ROA.34084-34085.

[93] ROA.34084-34085.

Island, Delta Duck Club, and Golden Meadow Fields) were all designated as "critical fields essential to the war program" because they produced "preferential type crudes used for making aviation gasoline," the Delacroix Island Field was **not** designated as such a "critical field."[94]

In sum, the evidence of record shows that: (1) Delacroix Island Field production accounted for much less than 1% of the crude oil used by the Port Arthur refinery in **all** of its refining operations; (2) the refining of avgas was less than 5% of the overall refining operation; and (3) while many Louisiana oil fields were designated as "critical fields essential to the war program" because these fields produced "preferential type crudes used for making aviation gasoline," the Delacroix Island Field was not such a field. There is simply no evidence that, as Appellants contend and *Chevron* requires, "large quantities of crude oil produced in the Delacroix Island Field" were used "to fulfill" the Avgas Contracts. Indeed, it cannot be reasonably inferred that **any** production from the Delacroix Island Field was "essential feedstock" for avgas refining, as opposed to "feedstock" for the many

---

[94] ROA.31693-31694; ROA.34009-34028 (explanation of listing at ROA.34011, Garden Island and Golden Meadow Fields, at ROA.34014, Delta Duck Field at ROA.34027). Such a designation was a significant factor in the *Chevron* decision. *see Chevron*, 146 S.Ct. at 1061-62 ("The P.A.W. identified Delta Duck Club as a "Critical Fiel[d] Essential to the War Program" because it produced a "preferential" kind of crude oil for refining avgas.") (brackets and quotation marks in original) (citing appellate record). Defendants' evidence also shows that The Texas Company's production of the "preferential type crudes used for making aviation gasoline" from the Garden Island Field dwarfed total production from the Delacroix Island Field. ROA.31732; ROA.31741.

other petroleum products that The Texas Company manufactured, in much larger quantities than avgas, and sold during World War II. Consequently, Appellants cannot, under *Chevron*, establish by a preponderance of the evidence that a lawsuit challenging production practices in the Delacroix Island Field "relates to acts under color of" the DSC.

## VI. DEFENDANTS DO NOT HAVE A COLORABLE FEDERAL DEFENSE THAT ARISES FROM THEIR OFFICIAL DUTIES

### A. THE COLORABLE FEDERAL DEFENSE REQUIREMENT IS THE SOURCE OF ARTICLE III JURISDICTION

Federal officer jurisdiction "must be predicated on the allegation of a colorable federal defense" that arises from the performance of a federal duty.[95] This "colorable federal defense" requirement is derived from the "act under color of *such office*" language of Section 1442.[96] "[T]he statute's requirement that a removing party assert a colorable federal defense remains a constitutional, viable, and significant limitation on removability,"[97] and is "the very source of the court's constitutional jurisdiction over the claim."[98] Section 1442 "cannot independently support [Article III] 'arising under' jurisdiction" because it is a "pure jurisdictional statute" that does "nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant."[99] Thus, "it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the

---

[95]*Mesa v. California*, 489 U.S. 121, 129 (1989).

[96]*Mesa*, 489 U.S. at 135. ("[W]e concluded that 'in the performance of his duties' meant no more than 'under color of office,' and *that Congress meant by both expressions to preserve the pre-existing requirement of a federal defense for removal.*") (emphasis added); *Willingham v. Morgan,* 395 U.S. 402, 406-07 (1969)(same); *Jax Leasing v. Xiulu Ruan*, 359 F.Supp.3d 1129, 1136 (S.D. Ala. 2019) ("requirement of a colorable federal defense flows from the 'act under color of such office' language").

[97] *Latiolais,* 951 F.3d at 296 (citing *Mesa*, 489 U.S. at 136-37).

[98] *Williams v. Todd Shipyards*, 154 F.3d 416 (5th Cir.1998) (quoting *Mesa,* 489 U.S. at 136).

[99] *Mesa*, 489 U.S. at 136.

action against the federal officer arises for Art. III purposes."[100] Section 1442 "merely serves to overcome the 'well-pleaded complaint' rule which would otherwise preclude removal even if a federal defense were alleged."[101]

## B. TEXTUAL ANALYSIS OF COLORABLE FEDERAL DEFENSE ELEMENT

Section 1442 permits removal of a "civil action . . . that is against or directed to . . . any [federal] officer (or any person acting under *that officer*) . . . for or relating to any act under color of *such office*" (emphasis added). The Dictionary Act, 1 U.S.C. § 1, defines "officer" as "any person authorized by law to perform the duties of the office." Thus, the federal authority of a "person" who "act[s] under" a federal officer does not extend beyond "*that officer[*'s*]*" authority under federal law.

To remove under Section 1442, a private "person" must show that he or she is "acting under" a federal "officer," not the "United States" or an "agency thereof," as the parenthetical phrase "any person acting under *that officer*" makes specific reference only to the word "officer," not to the "United States" or an "agency thereof."[102] The statute's requirement that the removed action be "for or relating to

---

[100]*Id.*

[101] *Id.* (citations omitted).

[102]*International Primate*, 500 U.S. at 79-84, (conducting rigorous textual examination of Section 1442 and concluding that version of statute in effect at that time provided a right of removal only to "federal officers" and those acting under such "federal officers," and not to "federal agencies"). While *International Primate* was later legislatively overruled by the amendment allowing the United States and federal agencies to utilize Section 1442 removal, this amendment did not revoke the pre-existing statutory requirement that a person "act under" a particular "federal officer" in order to qualify for removal under the statute. The exclusivity of the jurisdictional link between "federal officers" and those "acting under" them is further evidenced by the fact that the

any act under color of ***such office***" refers back to the specific "office" of the federal "officer" under whom the defendant is "acting" (here, the DSC). The phrase "under color of [federal] office" means "in the performance of [federal] duties."[103] By tying the "acting under" element to acts taken "under color of such office," the statutory text limits the acts of private defendants subject to federal direction to acts involving a federal officer's official duties.[104]

Consequently, any federal defense premised on an "act under color of such office" must arise from the performance of the duties of a federal officer's office. A private party's federal defenses to acts not conducted under color of federal office cannot support Article III "arising under" jurisdiction. Thus, any federal defense to private "charged conduct" that may "relate to" a suit against a person "acting under" a federal officer cannot satisfy the colorable federal defense element simply because the statutory text limits the acts of a person "acting under" a federal officer ("acting

---

1996 amendment that granted federal agencies the right to remove under Section 1442 invokes the clause of Article III, section 2, which extends the "judicial power . . . to Controversies in which the United States shall be a party," and not the initial clause of that section (the clause applicable to "federal officers" and those "acting under" them), which extends the judicial power to cases "arising under" federal law. *City of Cookeville v. Upper Cumb. Elec. Member. Corp.*, 484 F.3d 380, 391 (6th Cir. 2007); *accord, Katsigiannis v. M.H. Parsons & Sons Lumber Co., Inc.*, 2025 WL 2778102, * 2-3 (D. N.H. Sept. 26, 2025) (collecting cases).

[103]*Mesa*, 489 U.S. at 135, quoted at Note 97, *supra.*

[104]*See* block quotes from *Willingham, Arizona, Mesa, and Isaacson*, *infra*, pages 35-36; *see also Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1313 (9th Cir. 1981) ("Act under color of such office" provision "restricts or clarifies the types of cases" removable under Section 1442.).

under" element) to "act[s] under color of federal office" (colorable federal defense element).While the 2011 amendment modified Section 1442 by extending federal officer jurisdiction to suits that challenge conduct only "related to any act under color of [a federal officer's] office," that amendment did not disturb the statutory language that is the basis for the colorable federal defense element, or otherwise purport to change the colorable federal defense requirement.

## C. THE JURISPRUDENCE UNIFORMLY SUPPORTS THE FORGOING TEXTUAL ANALYSIS

Appellants argue that "[n]either the Supreme Court nor this Court has ever recognized" that Section 1442 "requires a federal defense '*arising out of* [the defendant's] *official duties.*'" Doc. 204, p. 60. Actually, the Supreme Court has consistently held that the defense must arise from the performance of official (federal) duties, *i.e.*, acts "under color of federal office," and has never recognized otherwise:

> [The Government] argues that the removal statute is an incident of federal supremacy, and that one of its purposes was to provide a federal forum for ***cases where federal officials must raise defenses arising from their official duties***. On this view, the test for removal should be broader, not narrower, than the test for official immunity. We agree. [105]
>
> Historically, removal under § 1442(a)(1) and its predecessor statutes was meant to ensure a federal forum in any case where a federal official is entitled to ***raise a defense arising out of his official duties***. The act of removal permits a trial upon the merits of the state-law question free

---

[105] *Willingham*, 395 U.S. at 405 (emphasis supplied). This language was later repeated, approvingly, in *Mesa,* 489 U.S. at 137.

from local interests or prejudice. It also enables the defendant to have the validity of his immunity defense adjudicated, in a federal forum. For these reasons, this Court has held that the right of removal is absolute *for conduct performed under color of federal office*, and has insisted that the policy favoring removal should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).[106]

Accordingly, we concluded that *"in the performance of his duties" meant no more than "under color of office," and that Congress meant by both expressions to preserve the pre-existing requirement of a federal defense for removal*. Again, we see no reason to depart from this long-standing interpretation of Congress' intent in enacting the removal statute.

\* \* \* \* \*

We are simply unwilling to credit the Government's ominous intimations of hostile state prosecutors and collaborationist state courts interfering with federal officers by charging them with traffic violations and other crimes for which they would have no federal defense in immunity or otherwise. That is certainly not the case in the prosecutions of Mesa and Ebrahim, nor was it the case in the removal of the state prosecutions of federal revenue agents that confronted us in our early decisions. In those cases where true state hostility may have existed, it was specifically directed against *federal officers' efforts to carry out their federally mandated duties*.[107]

And these principles have been consistently applied by the lower federal courts.

At its core, the defense prong requires that the defendant raise a claim that is defensive and based in federal law. *More specifically, such defense must arise out of the party's official duties*. . . . The federal defense requirement is satisfied in all cases where federal officers can

---

[106] *Arizona v. Manypenny*, 451 U.S. 232, 241-42 (1981) (emphasis supplied) (internal quotation marks and citations omitted).

[107] *Mesa*, 489 U.S. at 135, 138-39 (emphasis supplied).

raise a colorable defense ***arising out of their duty to enforce federal law***.[108]

The question remains, however, whether the 2011 amendment to Section 1442, which did not change the "under color of such office" language that supports the colorable federal defense element, nonetheless somehow modified the contours of this distinct element.

The phrase "under color of [federal] office" means "in the performance of [federal] duties."[109] While the *Chevron* Court expressly declined to directly address the colorable federal defense element, its opinion nonetheless confirms that the 2011 amendment effected no modification of the colorable federal defense element. In rejecting "Louisiana's theory" that Section 1442 "requires that [a] defendant ['act under'] a federal officer in taking the specific actions challenged in the suit," the Supreme Court observed:

> The statute permits the removal of state-court suits against "any officer (or any person acting under that officer)" that are "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). It contemplates removal of suits against officers or their agents for acts that were not done under color of their offices, ***so long as the suits "relat[e] to" such acts***.[110]

---

[108] *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138-39 (2d Cir. 2008) (emphasis supplied) (internal quotation marks and citations omitted).

[109] *Mesa*, 489 U.S. at 135,109 S.Ct. 959, quoted at Note 97, *supra*.

[110] *Chevron,* 146 S. Ct. 1052, 1063.

Here, *Chevron* confirms that acts not done under color of federal office must relate to acts in the performance of a federal duties that are subject to a colorable federal defense. The Court anticipated and summarily foreclosed the argument Appellants now urge, thus implicitly affirming this Court's observation in *Latiolais* that the distinct colorable federal defense requirement "significantly" limits removability under Section 1442.

Appellants attempt to sidestep *Chevron* by quoting only the second sentence of the foregoing block quote [see Doc. 204, p. 62] and then suggesting that the phrase "such acts" in that sentence refers to the acts constituting the conduct challenged in the complaint, thus departing from the Supreme Court's recitations in *Mesa* and *Manypenny*. Obviously, in the context of these two sentences in the block quote, the phrase "such acts" in the second sentence refers to the "acts under color of such [federal] office" in the first sentence. Appellants' suggested interpretation would require that *Chevron* be nonsensically read as finding that the statute "contemplates removal of suits against officers or their agents for acts that were not done under color of their offices, so long as the suits "relat[e] to" acts not done under color of their offices. It is no coincidence that this Court in *Latiolais* cites to *Mesa* in support of its finding that, despite the 2011 expansion of the causal nexus test, the colorable federal defense element operates as "significant limitation on removability."[111]

---

[111]*Latiolais,* 951 F.3d 286, 296 ((emphasis added).

Furthermore, in both the pre-2011 and post-2011 versions of the statute, the "acting under" federal officer element is textually tied to "act[s] under color such office." In 2011, the statute was amended to cover suits both "for" and "relating to" an "act under color of such office," but the phrase "such office" remains as an *explicit* reference to the office of the officer the defendant is "acting under."

Appellants fail to cite a single decision which has yet held that the distinct colorable federal defense element was modified by the 2011 amendment. On the other hand, the First, Fourth, and Ninth Circuits have affirmed the continued viability of the pre-2011 Supreme Court jurisprudence. See *West Virginia ex rel. Hunt v. Caremark PCS Health, LLC*, 140 F.4th 188, 198 (4th Cir. 2025) ("A colorable federal defense is one that 'is defensive and based in federal law,' and that 'arise[s] out of a defendant's official duties.'"); *County Bd. of Arlington County v. Express Scripts Pharmacy*, 996 F.3d 253, 254 (4th Cir. 2021) ("'The Supreme Court has emphasized that such a defense must 'aris[e] out of [a defendant's] official duties.'") (quoting *Manypenny*, 451 U.S. at 241); *City & County of Honolulu*, 39 F.4th at 1110 ("Prong two requires Appellants to assert a colorable federal defense. The defense must arise out of defendant's official duties."); *Government of Puerto Rico*, 119 F.4th at 187 (observing that if a plaintiff "sues a defendant for the defendant's conduct on private property divorced from the work that it performed for a federal officer," the defendant "could not raise a colorable federal defense arising from its private

conduct") (citations omitted).[112] While this Court has not directly applied the pre-2011 formulation as a rule of decision in a post-2011 case, it has adopted this formulation in at least one post-2011 case. *Humphries v. Elliot Co.*, 760 F.3d 414, 416-17 (5th Cir. 2014) ("The purpose of § 1442(a)(1) is to 'ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties.'") (quoting *Manypenny*, 451 U.S. at 241). A decision in this case that would jettison the requirement that the colorable federal defense element arise from the performance of a federal duty and depart from the unbroken line of circuit jurisprudence will at a minimum cause a circuit split.

The purpose of Section 1442 is "to ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties."[113] While a removing defendant is no longer required to show that it acted "under color

---

[112]Post-2011 district court cases have also consistently required colorable federal defenses to arise out of the performance of federal duties. *See, e.g., United States v. Leventhal*, 2024 WL 38581760, *2 (E.D. Wis. Aug. 19, 2024) ("Nor are his claimed civil rights violations a 'colorable federal defense,' as such a defense must 'aris[e] out of [the defendant's] duty to enforce federal law.'") (quoting *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010) (quoting *Willingham*, 395 U.S. at 406-07, 89 S.Ct. 1813); *Attorney General of State of New Jersey v. Dow Chemical Co.*, 2024 WL 1740087, *11 (D. N. J. April 23, 2024) ("[T]he defendant must establish that it arises out of defendant's official duties."), *aff'd*, 140 F.4th 115 (3d Cir. 2025); *In re National Prescription Opiate Litig.*, 327 F.Supp.3d 1064, 1069 (N.D. Ohio 2018) ("The purpose of federal officer removal jurisdiction is to ensure that federal officers can raise colorable federal defenses arising out of their duty to enforce federal law and are given the impartiality of a federal forum.") (citing *Bennett* and *Willingham*); *Kelley v. Abram*, 2017 WL 586360, *1 (D. Minn. Feb. 13, 2017) ("To qualify for removal, however, [Abram] must also raise a 'colorable federal defense arising out of his duty to enforce federal law. In other words, there must be a causal nexus between the challenged conduct and the defendant's official authority.").

[113]*Manypenny*, 101 S.Ct. at 1664 (1981)(emphasis added); *Mesa*, 489 U.S. at 133.'"

of federal office" when engaged in the challenged conduct, it remains obligated to prove the existence of a colorable federal defense arising from its official duties. In *Latiolais,* this Court observed that "[p]ermitting removal of all acts 'relating to' an act under color of federal office *that meet the other requirements of removal* did not radically change the Federal Officer Removal Statute."[114]

Stated differently, *Latiolais* instructs that the 2011 amendment did not effect a change in the colorable federal defense requirement. Accordingly, this Court in *Latiolais* rejected the plaintiff's "policy related complaints" that the literal application of the "relating to" standard "suffuses indeterminacy" in place of "workable standards" by noting that "the statute's requirement that a removing party assert a colorable federal defense remains a constitutional, viable, ***and significant limitation*** on removability."[115] This limitation would no longer be significant if it were tied to the "relating to" element.

Notably, Chevron has conceded in briefing in this Court that "the colorable federal defense requirement will have a narrowing effect and weed out cases that would otherwise pass their near limitless interpretation of the 'connected or associated with' element."[116] Even Judge Oldham's dissent in the vacated case

---

[114]*Latiolais,* 951 F.3d 286, 295.

[115] *Id.* at 296.(emphasis added).

[116] *BP Am. Prod. Co.*, 103 F.4th at 343.

acknowledges that "there will be factual situations in which a federal officer or someone acting under a federal officer could be engaged in activities *related to* the federal authority, yet no federal defense will apply."[117]

### D. APPELLANTS HAVE NO COLORABLE FEDERAL DEFENSES

In their removal notice, Appellants alleged pre-emption[118] and immunity[119] defenses, but did not allege a due process defense. On the other hand, Appellants raise due process and pre-emption defenses here, but do not allege immunity. Their abandonment of an immunity defense is telling in that the Supreme Court has observed that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court."[120]

"Most defenses do not flow from official duties."[121] This is the case with the two defenses Appellants assert, *i.e.*, "preemption," and "due process." Appellants fail to link these defenses to the performance of any duties of a federal office or federal officer, or any execution of federal law. In addition, Appellants fail to demonstrate that their pre-emption and due process defenses are "colorable."

---

[117] *Id.* at 355.

[118] ROA.55.

[119] ROA.54.

[120] *Willingham*, 395 U.S. at 407.

[121] *City & County of Honolulu*, 39 F.4th at 1110.

**Due Process**: This assertion fails at the threshold. "A "colorable federal defense" must be "defensive."[122] "A discriminatory or unconstitutional state law is not a *defense* to liability under federal law. It is a *source* of liability under federal law."[123] Furthermore, "[t]he defense must be raised in the defendant's notice of removal," and here it is not.[124]

Moreover, Appellants' "due process" defense does not arise out of or concern the performance of any duties (federal or otherwise) during World War II. Rather, it rises out of the filing of this lawsuit, conduct that occurred in the 21ST century. This "defense" not only does not arise out of any execution of the duties of the DSC; it cannot even conceivably "relate to" avgas refining or any other putative performance of the DSC's official duties. Such a defense, which protects only private conduct and lacks any nexus with any federal office or officer, does not satisfy the colorable federal defense element.

Finally, Appellants' "due process" claim is not colorable. Appellants fail to point to any liberty or property interest they have actually lost due to the Parish's putative effort to enforce its regulations retroactively, as required to establish a

---

[122] *Clark v. United States*, 2018 WL 11312978, *2 (E.D. Mo. Aug. 9, 2018) (quoting *Mesa*, 489 U.S. at 129–30).

[123] *CSWS LLC v. Village of Bedford Park*, 2008 WL 4148530, *2 (N.D. Ill. Aug. 29, 2008) (brackets omitted) (emphasis in original) (quoting *Quinoes v. City of Evanston*, 58 F.3d 275, 277 (7th Cir.1995)).

[124] *Blum v. AT&T Corp*, 2025 WL 2792249, *12 (W.D. La. Sept. 12, 2025) (citing *Latiolais*, 952 F.3d at 290).

violation of substantive due process.[125] This is because "[t]he conclusion that a particular rule operates 'retroactively' comes ***at the end of a process of judgment***,"[126] and there is not yet any judgment applying any law retroactively in such a way as to divest Appellants of any liberty or property interest.[127] As regards procedural due process, in *Holloway v. Parker* this Court, applying the *Parratt-Hudson* doctrine, held (in the context of an action by an oil company alleging a state judge and litigants conspired to deprive them of a fair trail in state court) that federal due process guarantees were sufficiently served the availability of postdeprivation remedies in the state court appellate system.[128] Appellants fail to make a showing that even approaches that which was conclusively rejected by this Court in *Holloway*.

---

[125] *Simi Inv. Co., Inc. v. Harris County, Tex.*, 236 F.3d 240, 249-52 (5th Cir. 2000). For this reason, *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), upon which Appellants rely, is inapposite, as it involves a habeas corpus proceeding challenging an existing deprivation of liberty (confinement in prison). *See* Doc. No. 204, at 59.

[126] *Landgraf v. USI Film Products*, 511 U.S. 244, 270 (1994).

[127] Nor will there ever be such a judgment. The Parish does not seek a retroactive application of the statute and regulations. Under the statutes and regulations (*see* La. R.S. 49:214.21 *et seq*.; 43 La. Admin. Code Pt I, 700, *et seq*.) an operator who "legally commenced or established" an "individual specific use" before the start of the permitting program was not required to obtain a permit to continue that use after the start of the program if the use was not substantially changed after its commencement. However, uses illegally commenced before but continued after the start of the program required a permit, because such uses are "uses" as defined in the statute. Pre-program uses terminated before the start of the program are excluded from the program, and are thus not actionable, *even if such uses were illegal under applicable law*. The only actionable pre-program uses at issue here are illegally commenced or established pre-program uses continued after the program without a permit, or violations of permits issued for such uses.

[128] 784 F.2d 1287 (5th Cir. 1986).

**Pre-emption**: Appellants allege conflict preemption based on wartime federal regulations promulgated by the PAW, but altogether fail to show that it was impossible to both comply with federal wartime directives and then, 35 years later, comply with the SLCRMA. Moreover, they fail to allude to a single federal statute that might conflict with or otherwise pre-empt Plaintiffs' efforts to enforce the SLCRMA.

Appellants also fail to address the fact that this action, which enforces Louisiana's Coastal Zone Management (CZM) Laws, is authorized by federal law, namely the Coastal Zone Management Act of 1972, 16 U.S.C. § 1456 *et seq*. ("CZMA"). The CZMA not only authorizes this action, but also expressly requires that federally regulated activities must be conducted in a manner consistent with the State's program, thus establishing a form of "reverse pre-emption" in the favor of the State's CZM laws.[129] Appellants' pre-emption argument is not colorable because Appellants "cannot deny the significance of the Coastal Zone Management Act's grant of power and concurrent authority to the states."[130]

Appellants point to Judge Feldman's ruling in *Riverwood* and Judge Oldam's dissent in *Plaquemines Par. v. BP Am. Prod. Co.*, 103 F.4th at 355-56 as affirming

---

[129] 16 U.S.C. § 1456; *see Stutes v. Gulfport Energy Co.*, 2017 WL 4286846, * 13-14 (W.D. La. June 30, 2017); Carlson and Mayer, *Reverse Preemption*, 40 Ecology L.Q. 583 (2013).

[130] *Stutes*, 2017 WL 4286846, * 13 (citing Carlson and Mayer, *Reverse Preemption*, *supra*).

the validity of their colorable federal defenses.[131] They conveniently fail to mention that Judge Feldman found that defendants' pre-emption defense would be viable only if the PAW crude production regulations were deemed to be federal directives.[132] Likewise, Judge Oldham's dissent in the vacated panel decision is based on colorable federal defenses arising from conduct involving federal WWII crude production regulations, not refinery contracts.

Even if one assumes colorable federal defenses need not arise from, but must only be connected to, federal directions, the statutory text nonetheless unequivocally requires that a defendants act under a "federal officer," and the term "federal officer" does not, as a matter of law, include a "federal agency."[133] The refinery contracts were granted by the federal officers who worked for the DSC,[134] not the PAW. On the other hand, the regulations upon which Appellants base their colorable federal defenses were regulations of the PAW, a separate agency. Notably, in every post-2011 Section 1442 case in which this Court has held that a "colorable federal defense" of preemption exists, the federal laws effecting the preemption were the

---

[131] Doc. 204, 56-57.

[132] *Par. of Plaquemines v. Riverwood Prod. Co.*, 2022 WL 101401, *6 (E.D. La. Jan. 11, 2022).

[133] *See* Notes 38, 102, *supra*.

[134] *See* Note 37, *supra*.

same federal laws executed by the "federal officer" which the removing defendant "acted under."[135]

Lastly, the facts alleged in support of Appellants' pre-emption defense (which is based entirely on statements in the *Rozel* expert report that triggered this removal) are not supported in the record. Appellants allege that "Plaintiffs claim that Louisiana law (during WWII) required Defendants to build 'overland roads' to their oil production facilities, instead of dredging canal, and to use 'steel tanks,' rather than earthen pits, at the heads of oil wells."[136] Not so.

Appellees have never disputed that some level of canal dredging was necessary. The *Rozel* report merely states that land loss and pollution should have been minimized by employing alternative measures such as directional drilling, subsurface injection, and "[a] *limited number* of roads [] built to central areas where land operations could be conducted,"[137] and that these alternative measures were largely disregarded in favor of the *overuse* of dredged canals.[138] In fact, Appellees unwittingly provided evidence that proved this point by offering a 1944 Oil and Gas

---

[135] *Caris*, 108 F.4th at 347 (Medicare Act and associated regulations); ); *St. Charles Surg. Hosp. v. Louisiana Health*, 935 F.3d 352, 357-58 (5th Cir. 2019) (Federal Employees Health Benefits Act and associated regulations); *Butler v. Coast Elec. Power Assoc.*, 926 F.3d 190, 198-200 (5th 2019) (Rural Utilities Service regulations).

[136] Doc. 204, p. 24.

[137] ROA.208.

[138] ROA.79, 82, 90.

Journal article that notes that "operators in a number of instances have elected to excavate canal systems in areas in which the surface is comparatively dry most of the time and where land drilling rigs could have been used and roads provided without too much difficulty."[139] Nowhere in the *Rozel* Report is there any suggestion that dredging should have been avoided altogether, or that roads should always have been used. Appellants cite only 6 Fed. Reg. 5880. 5880 (Nov. 19, 1941) for their assertion that the government discouraged the use of steel tanks, but the clear text of this regulation applies only to metal "containers" used for "petroleum or petroleum products" such as "drums, cans, and tubes," not steel tanks used for crude production.

Quoting the Rozel Report, Appellants allege that Plaintiffs "suggest" that they "should have adopted 'alternative' practices in the early 1940[]s that would have 'reduced production rates.'"[140] The *Rozel* report says precisely the opposite, to wit: "[Directional drilling that should have been employed] had the advantage of drilling from a central location and eliminating or reducing long surface flowlines that reduce production rates and increased leaks and spill." ROA.205. In other words, Plaintiffs' alternatives would have increased production rates, not reduced them! Moreover, Appellants did not "take issue" with the "24/7 nature" of Appellants

---

[139] ROA.23963.

[140] Doc. 204, pp. 58-59.

operations. The *Rozel* report merely observes: "[T]he 24/7 nature of operations of equipment generated accelerated wave action that erodes levees and destroys marshes."[141] The "24/7" nature of oil production is the nature of oil production generally, not just WWII Louisiana coastal production. The report criticizes the excessive use of access canals that erodes levees and destroys marsh, not the fact that crude production was an around-the- clock enterprise.

The bottom line is that Appellants have failed to demonstrate that preemption is a "colorable" federal defense, even if the Court is willing to ignore the Supreme Court's repeated admonition, and the dominant view in the federal courts (including every circuit that has addressed the issue), that the defense must arise out of acts "under color of such office" ("such office" here being the DSC).

---

[141] ROA.89.

## CONCLUSION

This Court should affirm the District Court's order remanding this case to state court.

Respectfully submitted,

*/s/ Victor L. Marcello*
Victor L. Marcello
Alfred Paul LeBlanc, Jr.
TALBOT, CARMOUCHE & MARCELLO
17405 Perkins Road
Baton Rouge, LA 70810
Telephone: (225) 400-9991
vmarcello@tcmlawoffice.com

Darren Sumich
David A. Parsiola
Brandon J. Taylor
COSSICH, SUMICH, PARSIOLA &
TAYLOR, L.L.C.
8397 Highway 23, Ste. 100
Belle Chasse, LA  70037-2648
Telephone: (504) 394-9000

W. Peter Connick
CONNICK AND CONNICK
3421 N. Causeway Blvd., Ste. 408
Metairie, LA 70002
Telephone: (504) 838-8777

Bruce D. Burglass, Jr.
André C. Gaudin
Scott O. Gaspard
BURGLASS & TANKERSLEY, LLC
5213 Airline Drive
Metairie, LA  70001-5602
Telephone: (504) 836-0407

*Counsel for Plaintiff-Appellee, Plaquemines Parish*

**CERTIFICATE OF SERVICE**

I certify that on July 21, 2026, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ Victor L. Marcello*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this brief complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 27 because it contains 12,915 words (excluding those matters excluded from the word count by Federal Rule of Appellate Procedure 32(f)); and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Office 2024 (the same program used to calculate the word count).

Dated:  July 21, 2026                    */s/ Victor L. Marcello*