No. 23-30336

# In the United States Court of Appeals for the Fifth Circuit

PLAQUEMINES PARISH,
*Plaintiff-Appellee*,

v.

LOUISIANA STATE, EX REL. ELIZABETH B. MURRILL, ET AL.,
*Intervenor Plaintiffs-Appellees,*

v.

CHEVRON USA HOLDINGS, INCORPORATED, ET AL.,
*Defendants-Appellants*,

———————————

On Appeal from the United States District Court
for the Eastern District of Louisiana
No. 2:18-cv-05189 (Barbier, J.)

———————————

## BRIEF FOR APPELLEES STATE OF LOUISIANA AND LOUISIANA DEPARTMENT OF ENERGY AND NATURAL RESOURCES

———————————

J. Blake Canfield
 Executive Counsel
LOUISIANA DEPARTMENT
 OF ENERGY AND
 NATURAL RESOURCES
617 N. Third St.
Baton Rouge, LA 70802

LIZ MURRILL
 ATTORNEY GENERAL
J. Benjamin Aguiñaga
 Solicitor General
Kelsey L. Smith
 Deputy Solicitor General
OFFICE OF THE LOUISIANA
ATTORNEY GENERAL
1885 N. Third Street
Baton Rouge, LA 70802
Telephone: (225) 506-3746
AguinagaB@ag.louisiana.gov

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellees—as "governmental" parties—need not furnish a certificate of interested persons.

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled oral argument in this case for August 5, 2026.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .............................................ii

STATEMENT REGARDING ORAL ARGUMENT ................................ iii

TABLE OF AUTHORITIES ......................................................................vi

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

ISSUE PRESENTED ................................................................................ 10

ARGUMENT .............................................................................................. 10

I.      THE COURT NEED DO NO MORE THAN REMAND
        THIS CASE. ..................................................................................... 10

II.     ON REMAND TO THE DISTRICT COURT, SERIOUS
        DEFECTS WILL CONFIRM THIS CASE APPROPRIATELY
        REMAINS IN STATE COURT.......................................................... 11

        A.      Appellants Have Waived Any Right to a Federal
                Forum. ................................................................................... 12

        B.      Appellants' New "Acting Under" Theory Is
                Meritless. .............................................................................. 19

                1.      Collateral estoppel now forecloses Appellants'
                        "acting under" theory............................................. 20

                2.      The new "acting under" theory is not preserved. .............. 29

                3.      The alleged refining activities do not satisfy the
                        "acting under" prong................................................. 33

        C.      Appellants Have No Colorable Federal Defense...................... 40

                1.      The preemption defense is waived. .................................. 41

2.  The due process defense is unpreserved and, in any event, unreviewable in this posture. ........................44

3.  In all events, neither defense addresses the refining conduct allegedly under color of federal office....................................................................................48

III. THE COURT SHOULD DECLINE TO FACILITATE APPELLANTS' GAMESMANSHIP...................................................................53

CONCLUSION ......................................................................................60

CERTIFICATE OF SERVICE...............................................................62

CERTIFICATE OF COMPLIANCE ......................................................63

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Abraham Watkins Nichols Agosto Aziz & Stogner v. Festeryga,*
155 F.4th 456 (5th Cir. 2025) .................................................. 5, 13, 17

*Agostini v. Felton,*
521 U.S. 203 (1997) ..................................................................... 52

*Agrilectric Power Partners, Ltd. v. Gen. Elec. Co.,*
20 F.3d 663 (5th Cir. 1994) ......................................................... 24

*In re Alabama & Dunlavy, Ltd.,*
983 F.3d 766 (5th Cir. 2020) ...................................... 43, 48, 56, 57

*Astron Indus. Assocs., Inc. v. Chrysler Motors Corp.,*
405 F.2d 958 (5th Cir. 1968) .................................................. 23, 24

*Banda v. City of McAllen, Tex.,*
2025 WL 3094122 (5th Cir. Nov. 4, 2025) ................................... 13

*Bennett v. W. Tex. State Univ.,*
799 F.2d 155 (5th Cir. 1986) ....................................................... 39

*In re Blackwater Sec. Consulting, LLC,*
460 F.3d 576 (4th Cir. 2006) ....................................................... 41

*Brown v. Demco, Inc.,*
792 F.2d 478 (5th Cir. 1986) ....................................... 12, 13, 16, 17

*Caterpillar Inc. v. Lewis,*
519 U.S. 61 (1996) ....................................................................... 58

*Central Pines Land Co. v. United States,*
274 F.3d 881 (5th Cir. 2001) ....................................................... 39

*Chevron USA Inc. v. Plaquemines Par., La.*,
146 S. Ct. 1052 (2026) ................................................................. *passim*

*Chevron USA Inc. v. Plaquemines Par., La.*,
No. 22-715 (U.S.) ............................................................................ 31

*City of Oakland v. B.P. P.L.C.*,
No. 22-16810, 2023 WL 8179286 (9th Cir. 2023) ...................... *passim*

*City of Oakland v. BP P.L.C.*,
2022 WL 14151421 (N.D. Cal. Oct. 24, 2022), *aff'd, City of
Oakland v. BP PLC*, 2023 WL 8179286 (9th Cir. Nov. 27,
2023) ............................................................................................. *passim*

*City of Oakland v. BP PLC*,
969 F.3d 895 (9th Cir. 2020) ........................................................ 31

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
91 F.4th 342 (5th Cir. 2024) ......................................................... 52

*E.T. v. Paxton*,
41 F.4th 709 (5th Cir. 2022) ......................................................... 31

*Forty Six Hundred LLC v. Cadence Education, LLC*,
15 F.4th 70 (1st Cir. 2021) ...................................................... 57, 58

*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*,
754 F.2d 591 (5th Cir. 1985) ........................................................ 24

*Granny Goose Foods, Inc. v. Bhd. of Teamsters*,
415 U.S. 423 (1974) ...................................................................... 43

*Hinojosa v. Perez*,
214 F. Supp. 2d 703 (S.D. Tex. 2002) ........................................... 32

*Jose v. United Eng'rs & Constructors, Inc.*,
1994 WL 708774 (5th Cir. Nov. 30, 1994) .................................... 23

*Kariuki v. Tarango,*
709 F.3d 495 (5th Cir. 2013).................................................24

*Latiolais v. Huntington Ingalls, Inc.,*
951 F.3d 286 (5th Cir. 2020).................................................47

*Mesa v. California,*
489 U.S. 121 (1989)....................................................*passim*

*Meyer v. Delaware R. Constr. Co.,*
100 U.S. 457 (1879).................................................18

*In re Meyerland Co.,*
960 F.2d 512 (5th Cir. 1992).......................................43, 56

*Naghi v. Europe's Finest, Inc.,*
114 F. App'x 606 (5th Cir. 2004).................................42

*Nat'l Rifle Ass'n v. Vullo,*
602 U.S. 175 (2024).................................................60

*Neptune Shipmanagement Servs. PTE, Ltd. v. Dahiya,*
15 F.4th 630 (5th Cir. 2021).......................................28

*Par. of Plaquemines v. Chevron USA, Inc.,*
7 F.4th 362 (5th Cir. 2021).......................................33

*Par. of Plaquemines v. Northcoast Oil Co.,*
669 F. Supp. 3d 584 (E.D. La. 2023).................................39

*Par. of Plaquemines v. Rozel Operating Co.,*
No. 60-996 (25th Jud. Dist. Ct., Par. of Plaquemines)...........14, 15, 47

*Plaquemines Par. v. BP Am. Prod. Co. (Chevron III),*
2026 WL 1449936 (5th Cir. May 22, 2026)..............................*passim*

*Plaquemines Par. v. Chevron USA, Inc.,*
84 F.4th 362 (5th Cir. 2023)......................................*passim*

viii

*Plaquemines Par. v. Chevron USA, Inc. (Plaquemines II)*,
  2022 WL 9914869 (5th Cir. Oct. 17, 2022)..................................*passim*

*Plaquemines Par. v. Riverwood Prod. Co., Inc.*,
  No. 18-CV-5217 (E.D. La.) ....................................................... 46

*Plaquemines Parish v. BP America Production Co.*
  *(Chevron I)*,
  103 F.4th 324 (5th Cir. 2024) ..............................................*passim*

*Robertson v. U.S. Bank, N.A.*,
  831 F.3d 757 (6th Cir. 2016)............................................... 13, 17

*Robin Singh Educ. Servs. Inc. v. Excel Test Prep Inc.*,
  274 F. App'x 399 (5th Cir. 2008) ..............................................23

*Rosas v. Mich. Dep't of Health & Human Servs.*,
  2024 WL 5136894 (E.D. Mich. Dec. 17, 2024) .................................13

*Sentry Ins. v. Morgan*,
  101 F.4th 396 (5th Cir. 2024) ............................................ 1, 4, 12, 54

*Shephard v. AIX Energy, Inc.*,
  249 So. 3d 194 (La. App. 2018)................................................42

*Simon v. United States*,
  891 F.2d 1154 (5th Cir. 1990)................................................42

*State v. Wilcox*,
  2009 WL 5647218 (La. App. Dec. 23, 2009) ...................................42

*Stephens v. C.I.T. Grp./Equip. Financing, Inc.*,
  955 F.2d 1023 (5th Cir. 1992)................................................42

*Taylor v. Charter Med. Corp.*,
  162 F.3d 827 (5th Cir. 1998)................................................14

*The People of the State of Ca. v. BP P.L.C.*,
No. 17-CV-6011 (N.D. Cal.) ..............................................................23

*USX Corp. v. Adriatic Ins. Co.*,
345 F.3d 190 (3d Cir. 2003) .............................................................32

*Vines v. Univ. of La. at Monroe*,
398 F.3d 700 (5th Cir. 2005)............................................................23

*Watson v. Philip Morris Cos.*,
551 U.S. 142 (2007) ..................................................................35, 36

*Willingham v. Morgan*,
395 U.S. 402 (1969) .............................................................7, 32, 47

*Winters v. Diamond Shamrock Chem. Co.*,
149 F.3d 387 (5th Cir. 1998).....................................................*passim*

*Wood v. Crane Co.*,
764 F.3d 316 (4th Cir. 2014).............................................7, 32, 33, 45

**Statutes**

28 U.S.C. § 1442.......................................................................*passim*

28 U.S.C. § 1446.............................................................9, 28, 31, 56

28 U.S.C. § 1447.....................................................................9, 56, 59

28 U.S.C. § 1653..............................................................................32

28 U.S.C. § 2283..............................................................................59

La. Code Civ Proc. Art. 1916.........................................................16

## Other Authorities

Wright & Miller, 14C Fed. Prac. & Proc. § 3736
(4th ed. 2026)............................................................55, 56

Fed. R. App. P. 28(i)..............................................................1

Jack Brook,
*Chevron will be forced to cough up at least $740 million
after a decade-long trial ruled the oil company dumped
billions of gallons of wastewater into the Louisiana coast*,
Fortune (Apr. 4, 2025),
tinyurl.com/2k7k8mk3 (last visited July 20, 2026)..............................2

Louisiana Ecological Services,
*Coastal Wetlands Planning Protection and Restoration Act
(CWPPRA)*,
U.S. Fish & Wildlife Serv.,
tinyurl.com/rexx7ym5 (last visited July 20, 2026) ........................ 1, 2

*Officer*,
Black's Law Dictionary (12th ed. 2024) ........................................34, 35

U.S. Const. art. II, § 2, cl. 2.................................................34

## INTRODUCTION AND SUMMARY OF ARGUMENT

This appeal requires no more than a straightforward application of the principle that this Court "sits as a court of review, not of first view." *Sentry Ins. v. Morgan*, 101 F.4th 396, 399 (5th Cir. 2024) (citation omitted).[1]

For over a decade, Appellants Chevron[2] and Atlantic Richfield (and various assortments of their co-defendants across cases) have tried to find a path to federal court in this case and related cases concerning the disappearing Louisiana coast. During that time, the federal government estimates that Louisiana has lost over 100 square miles of coastal wetlands—or one football field every 83 seconds.[3] Natural disasters and the like, of course, may contribute to that loss. But so, too, have Chevron and Atlantic Richfield. In this case, a state court jury taken from one Louisiana community that sustains the oil and gas industry found (and Chevron did not dispute) that Chevron dumped billions of gallons of

---

[1] Under Federal Rule of Appellate Procedure 28(i), the State adopts by reference all portions of Plaquemines Parish's response brief insofar as they are consistent with the arguments below.

[2] Unless otherwise stated, this brief refers to all Chevron entities collectively as "Chevron."

[3] Louisiana Ecological Services, *Coastal Wetlands Planning Protection and Restoration Act (CWPPRA)*, U.S. Fish & Wildlife Serv., tinyurl.com/rexx7ym5 (last visited July 20, 2026).

wastewater into the Louisiana marsh over several years[4]—the same ecosystem that "supports over 20 percent of the 14 species of waterfowl, 75 percent of Louisiana's commercial fish and shellfish species, and produces 20 percent of the total seafood harvested in the U.S."[5]

Because their liability is inevitable, Appellants and their co-defendants have exhausted every removal theory possible—ostensibly because they believe their odds of blunting liability are better in federal court. Today, they claim that the federal-officer removal statute, 28 U.S.C. § 1442, is their white knight. A few months ago, the Supreme Court gave them a lifeline, holding that the defendants in a similar case can satisfy a single element in the federal-officer removal statute— namely, the requirement that the action be "related to" an act under color of law. *Chevron USA Inc. v. Plaquemines Par., La.*, 146 S. Ct. 1052 (2026) (referred to as *Chevron II* in this brief to distinguish this Court's own pre- and post-*Chevron* decisions). In so holding, the Supreme Court expressly declined to "address the other requirements of federal officer removal."

---

[4] Jack Brook, *Chevron will be forced to cough up at least $740 million after a decade-long trial ruled the oil company dumped billions of gallons of wastewater into the Louisiana coast*, Fortune (Apr. 4, 2025), tinyurl.com/2k7k8mk3 (last visited July 20, 2026).

[5] *Coastal Wetlands Planning Protection and Restoration Act (CWPPRA), supra* n.3.

*Id.* at 1062 n.5; *contra* Br.4 ("*Chevron* makes clear that the case was properly removed to federal court").

As the State told the motions panel, ECF 110 at 2, 7–8, this case should be sent back to the district court for consideration in light of *Chevron II*. That is because, as Appellants agree (Br.1, 13), the "related to" element was the sole basis of the district court's decision. The district court had no occasion to address the other removal requirements, or the problems for Appellants that have arisen while this appeal has been pending. *See* ROA.36333 n.48 ("Because the Court finds the removing Defendants have failed to establish the ['related to'] element, the Court need not address the other elements.").

Faced with the same situation in *Chevron* itself, the Fifth Circuit *Chevron* panel (Davis, Englehardt, Oldham, JJ.) ordered the following on remand from the Supreme Court: "[W]e REMAND the cases to the respective district courts for proceedings consistent with the Supreme Court's opinion." *See Plaquemines Par. v. BP Am. Prod. Co. (Chevron III)*, 2026 WL 1449936, at *1 (5th Cir. May 22, 2026). The State acquiesces in this panel issuing an identical order in this case—and that is all the Court need do to dispose of this appeal. After all, the Court "sits as a court

3

of review, not of first view." *Sentry Ins.*, 101 F.4th at 399 (citation omitted).

That is why, if Appellants' opening brief seems odd, that is because it is. It asks the Court to run the entire removal analysis in the first instance and give them a pass to federal court. That, of course, is not the role of a court of *review*. And that is especially so in this context where there are extremely serious (and fatal to Appellants) problems that warrant the district court's ordinary review in the first instance. Here is just a preview:

*First*, the State will argue to the district court that Appellants' post-remand conduct has waived any right to a federal forum. In 2023, Appellants consented to the district court lifting a stay of its remand order. Over the next two years or so, Appellants proceeded through pre-trial proceedings in the state court and ultimately a month-long Chevron trial that ended in a verdict for the State and Plaquemines Parish. In fact, rather than attempt to halt proceedings while *Chevron* was pending in the Supreme Court, Chevron told the state trial court (on the eve of trial) that "we're ready and eager to try the case" even though, it said, *Chevron* might impact the case. ECF 110, Ex. A at 192. More, after

Chevron lost the trial, it filed a motion asking the state trial court to enter Chevron's preferred final judgment. ECF 203-7. Only now—after Appellants experimented in the state court and did not like the results—have they decided to try to escape state court again. If ever there were an example of waiver due to a defendant "'invok[ing] the jurisdiction of the state court in resolving the issues presented by the original complaint,'" *Abraham Watkins Nichols Agosto Aziz & Stogner v. Festeryga*, 155 F.4th 456, 460 (5th Cir. 2025) (en banc) (citation omitted), this is it.

*Second*, the State will argue before the district court that Appellants' new "acting under" theory based on avgas-refining contracts is meritless for at least three reasons.

One, Appellants are now estopped from raising that theory. They do not disclose that, while this appeal has been pending, their parent companies litigated and lost this exact theory in the Ninth Circuit—in a judgment that has since resulted in a final remand order to California state court. *See City of Oakland v. BP P.L.C.*, 2022 WL 14151421 (N.D. Cal. Oct. 24, 2022), *aff'd, City of Oakland v. BP PLC*, 2023 WL 8179286 (9th Cir. Nov. 27, 2023). Basic estoppel principles thus foreclose Appellants from raising the same theory here.

Two, the new "acting under" theory is waived because it was not preserved in the Appellants' removal notice. As this Court has recognized, "[o]nly when [Appellants] were unsuccessful [with their original 'acting under' theory] did they construct the refinery argument," *Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362, 378 (5th Cir. 2023), "and hence a new refinery-based argument for federal officer removal was born," *id.* (citation omitted).

And three, the theory fails on its own terms. Appellants have not identified any particular federal officer they claim to have been acting under in refining avgas, and, in all events, the Ninth Circuit was exactly right to hold that Appellants have "merely [identified] their compliance with the law while executing arms-length business agreements to supply fuel and build fuel infrastructure." *City of Oakland*, 2023 WL 8179286, at *2. Because such agreements "fail to support an 'acting under' relationship," Appellants "were not 'acting under' federal officers." *Id.*

*Third*, the State will argue to the district court that Appellants' removal efforts independently fail because they have identified no colorable federal defense, for at least three reasons.

One, although Appellants claim to have a colorable preemption defense, they omit that—as far as the State can tell—Chevron never pressed such a defense at trial, perhaps because it was plainly meritless. By law (both federal and Louisiana), therefore, Chevron has waived any such defense in this lawsuit. And because Appellants rely exclusively on Chevron's supposed entitlement to removal, they have failed to preserve preemption as a defense.

Two, things are even worse for Appellants on their second alleged defense—due process. Appellants do not disclose that they never asserted this defense in their federal removal notice, which is independently fatal. *See Wood v. Crane Co.*, 764 F.3d 316, 324–25 (4th Cir. 2014). Nor do they disclose that they actually *lost* this defense in state trial proceedings, which is doubly fatal. A federal-officer defendant "need not win his case before he can have it removed," *Willingham v. Morgan*, 395 U.S. 402, 407 (1969), but, by the same token, a defendant who has *lost* his defense on the merits before he can secure removal cannot plausibly claim his defense is colorable.

Three, even if Appellants had live preemption and due process defenses, those defenses fail to address Chevron's alleged acts "under

7

color of [federal] office," *Mesa v. California*, 489 U.S. 121, 134 (1989)—the refining of avgas pursuant to federal contracts. *Mesa* makes clear that the colorable-federal-defense requirement rests in the statutory phrase "under color of [federal] office." Naturally, therefore, any such defense must address the relevant acts under color of federal office—which here, everyone agrees, is Chevron's *downstream* refining of avgas pursuant to federal contracts. Yet Appellants' brief preemption and due process arguments go only to Chevron's *upstream* exploration for and production of crude oil, which, this Court has held, are *not* acts under color of federal office. *See Plaquemines Par. v. Chevron USA, Inc. (Plaquemines II)*, 2022 WL 9914869 (5th Cir. Oct. 17, 2022). So Appellants have no cognizable defense here.

For these reasons, a remand to the district court plainly is in order so that the district court fairly may consider these issues in the first instance. That is why the State consents to an order identical to the *Chevron III* order: "[W]e REMAND the case[] to the [] district court[] for proceedings consistent with the Supreme Court's opinion." 2026 WL 1449936, at *1.

One final word about Appellants' conduct over the past few months: Time and again, they have desperately sought to halt and void the state trial proceedings that they "read[ily] and eager[ly]" embraced. ECF 110, Ex. A at 192. That same conduct is on display today, as they urge this Court to issue a "ruling no later than September 2, 2026, because (absent prompt action by this Court) the state court appears poised to enter final judgment on September 3." Br.42. (They leave out that the September 3 hearing scheduled by the state court is related to *Chevron's own motion for entry of final judgment*.)

For reasons detailed further below, the Court should decline Appellants' invitation to be complicit in open hostility to a careful state trial judge who has done his level best to conclude the trial proceedings Appellants eagerly invited. That is primarily because the state court's jurisdiction today (and since the October 2023 remand order) to adjudicate this case is clear. *See* 28 U.S.C. § 1446(d) (upon removal, "the State court shall proceed no further unless and until the case is remanded"); *id.* § 1447(c) ("[]upon" receiving a remand order, "[t]he State court may [] proceed with such case"). But more fundamentally, our federalism depends on comity between the federal and state

governments, not buccaneering under the flag of federal authority to the detriment of the states. This Court should not countenance such conduct. It should simply remand this case to the district court by issuing an order identical to the *Chevron III* order—and there, the district court may finally end this federal action.

## ISSUE PRESENTED

Whether the Court should "REMAND the case[] to the [] district court[] for proceedings consistent with the Supreme Court's opinion" in *Chevron II. See Chevron III*, 2026 WL 1449936, at *1.

## ARGUMENT

## I.   THE COURT NEED DO NO MORE THAN REMAND THIS CASE.

The proper disposition of this appeal is straightforward: The Court should proceed precisely as the Fifth Circuit *Chevron* panel proceeded on remand from the Supreme Court. There, the panel (Davis, Engelhardt, Oldham, JJ.) recognized that "[t]he Supreme Court vacated the judgment of our court, having concluded Chevron plausibly alleged its case satisfied the 'relating to' requirement in the federal officer removal statute, 28 U.S.C. § 1442(a)(1)." *Chevron III*, 2026 WL 1449936, at *1. "In turn," the panel continued, "we REMAND the cases to the respective district courts for proceedings consistent with the Supreme Court's opinion." *Id.*

As the State notified the motions panel in this case, "there is only one remaining course of action for the Court in *this* case: remand this case to the district court for proceedings consistent with *Chevron*." ECF 110 at 7. For that reason ("[a]nd in the interests of judicial efficiency"), the State "consent[s] to ... an order identical to the order entered by Judges Davis, Engelhardt, and Oldham: '[W]e REMAND the cases to the respective district courts for proceedings consistent with the Supreme Court's opinion.'" *Id.* at 7–8 (citing *Chevron III*, 2026 WL 1449936, at *1). The motions panel understandably did not (and perhaps could not) take that step, having no vehicle before it to issue such an order. But this merits panel does, just as the *Chevron* panel did. Accordingly, the Court need do no more than issue a remand order identical to the one issued by the *Chevron* panel—and that will dispose of this appeal.

II. **ON REMAND TO THE DISTRICT COURT, SERIOUS DEFECTS WILL CONFIRM THIS CASE APPROPRIATELY REMAINS IN STATE COURT.**

A remand is especially appropriate given the wide swath of removal issues that await the district court's consideration in the first instance. Without waiving additional issues,[6] the State has identified a handful

---

[6] For example, one issue not addressed by the State here is the Supreme Court's statement that "[w]e do not resolve whether the defendants in the related cases can satisfy the 'for or relating to' requirement" under the Supreme Court's new

below. Each of these issues independently ends Appellants' tireless efforts to remove this case years after it was remanded to state court—and the State would not oppose this Court ending this saga on any of these grounds. But because this Court "sits as a court of review, not of first view," *Sentry Ins.*, 101 F.4th at 399 (citation omitted), the State acknowledges that the district court appropriately should be the first court to consider these issues.

## A.   Appellants Have Waived Any Right to a Federal Forum.

Appellants' removal efforts will be deemed waived on remand to the district court because of their litigation conduct *after* they acquiesced in the district court lifting the stay of its own order remanding this case to Louisiana state court.

This Court has long held that, "[e]ven a defendant who petitions timely [for removal] may have waived its right to removal by proceeding to defend the action in state court or otherwise invoking the processes of that court." *Brown v. Demco, Inc.*, 792 F.2d 478, 481 (5th Cir. 1986). The sort of litigation conduct that triggers such a waiver includes "defend[ing]

---

framework. *Chevron*, 146 S. Ct. at 1062 n.5. It may be (as Appellants hope, Br.31–34) that the defendants in this particular case can copy-and-paste *Chevron*'s analysis here, *contra* Plaquemines Par. Br., but that is an intensely factual question appropriate for the district court's consideration in the first instance.

th[e] action in state court for [] years" through "answers, amended answers, motions of various kinds, third party demands, cross claims, amended cross claims, and participat[ion] in discovery and depositions." *Id.*; *accord Robertson v. U.S. Bank, N.A.*, 831 F.3d 757, 761 (6th Cir. 2016) ("[A] defendant may constructively waive the right to remove by taking substantial action in state court that manifests a willingness to litigate on the merits."); *Rosas v. Mich. Dep't of Health & Human Servs.*, 2024 WL 5136894, at *7 (E.D. Mich. Dec. 17, 2024) (forbidding defendants from "'improperly 'experiment[ing]' with their case[] in state court after the case was removed" (collecting citations)).

As this Court put it more recently, although a waiver "is no casual affair" in this circuit, a waiver in fact occurs "when a defendant has 'invok[ed] the jurisdiction of the state court in resolving the issues presented by the original complaint.'" *Abraham Watkins*, 155 F.4th at 460 (citation omitted). "Anything less—mere procedural skirmishing— does not suffice." *Id.*; *Banda v. City of McAllen, Tex.*, 2025 WL 3094122, at *3 (5th Cir. Nov. 4, 2025) ("lengthy, defensive actions" in state court trigger waiver).

Appellants' post-remand litigation conduct far exceeds this Court's waiver standard because Appellants have, for years, quite literally litigated this case from complaint to judgment in state court. Consider the following highlights:

- In October 2023, Appellants consented to the district court lifting the stay of its order remanding this case to the state court, ROA.36438—which resulted in the district court directing the clerk to send a certified copy of the remand order to the state court clerk, ROA.36443. Over the next year-and-a-half, Appellants engaged in every form of discovery, deposition, and pre-trial motion practice available. *See generally* Docket, *Par. of Plaquemines v. Rozel Operating Co.*, No. 60-996 (25th Jud. Dist. Ct., Par. of Plaquemines).[7]

- Both Appellants filed half a dozen summary-judgment motions—"Defendants' Motion for Partial Summary Judgment on Plaintiff's Claims and Theory of Recovery Based on Alleged Violations of Guidelines"; "Defendants' Motion for Partial Summary Judgment on Plaintiffs' Claims for Alleged Harm that Occurred Before the Effective date of SLCRMA's Coastal Management Program"; Chevron's "Motion for Partial Summary Judgment on Plaintiffs' Claims Based on Production-Induced Subsidence"; "Defendants' Motion for Partial Summary Judgment on the State and Local Coastal Resources Management Act's Grandfather Clause"; Atlantic Richfield's "Motion for Summary Judgment Declaring Unconstitutional the State's Imposition of Liability Under the State and Local Coastal Resources Management Act"; and Atlantic Richfield's "Motion for Summary Judgment on

---

[7] This Court may take judicial notice of documents filed in another court to establish the fact of such litigation and related filings. *See, e.g., Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829–30 (5th Cir. 1998).

14

Liability"—which the state court adjudicated in December 2024. ECF 203-2.

- Although the state court originally granted Atlantic Richfield's Motion for Summary Judgment on Liability, the court subsequently reversed that decision in a February 10, 2025 judgment. *See* Judgment, *Par. of Plaquemines v. Rozel Operating Co.*, No. 60-996 (25th Jud. Dist. Ct., Par. of Plaquemines Feb. 10, 2025). The same day, the state court granted Atlantic Richfield's request (joined by the Parish) to try the claims against Atlantic Richfield separately from the claims against Chevron. *See* Order, *Par. of Plaquemines v. Rozel Operating Co.*, No. 60-996 (25th Jud. Dist. Ct., Par. of Plaquemines Feb. 10, 2025).

- Chevron filed still more motions for summary judgment— "Motions for Partial Summary Judgment on Plaintiffs' Claims Based on Chevron's Use and Closure of Pits in the Operational Area and Plaintiffs' Claims Based on Chevron's Discharges of Produced Water"—which the state court adjudicated in February 2025. ECF 203-3.

- On the eve of trial, Chevron notified the state court that its certiorari petition in *Chevron* was pending and that the Supreme Court was "taking a hard look at it." ECF 110, Ex. A at 191. Chevron advised the state court, however, that "we're ready and eager to try the case." *Id.* at 192. And if it ultimately prevailed in removal proceedings, Chevron would simply argue (incorrectly, *see infra* Section III) that "a judgment from this Court may turn out to be void." *Id.*

- Chevron vigorously tried this case from March 2025 to April 2025.

- During trial, Chevron filed nine motions for directed verdict. *See* Docket, *Par. of Plaquemines v. Rozel Operating Co.*, No. 60-996 (25th Jud. Dist. Ct., Par. of Plaquemines) (Mar. 25, 2025 filings).

- Following trial and the jury's verdict, in April 2025 Chevron filed a motion asking the state trial court to enter Chevron's proposed final judgment: "Chevron's proposed judgment is consistent with SLCRMA and gives proper legal effect to the Court's findings and rulings as well as the representations made by counsel for the Parish during closing argument. In particular, the proposed judgment appropriately reflects the scope of relief authorized under SLCRMA and aligns with the Parish's own statements regarding the nature and extent of the claims asserted. *For these reasons, it should be adopted as this Court's 'final judgment' under Louisiana Code of Civil Procedure article 1916*." ECF 203-7 at 2 (emphasis added). Among other things, Chevron's proposed judgment states that "the findings of the jury are adopted as the findings of the Court," and provides for "judgment against Chevron/Texaco and in favor of Plaquemines Parish in the amount of SEVEN HUNDRED FORTY-FOUR MILLION, SIX HUNDRED THOUSAND DOLLARS ($744,600,000.00)[.]" ECF 203-7 at PDF p. 11. To ensure "a final, immediately appealable judgment," Chevron's proposed judgment also asks the state court to designate the judgment as "a final judgment … after determining that there is no just reason for delay." *Id.*

As that brief summary shows, if ever there were a textbook example of a defendant that "waived its right to removal by proceeding to defend the action in state court or otherwise invoking the processes of that court," *Brown*, 792 F.2d at 481, this is it. Indeed, there is no state court process that Appellants *did not* invoke. Having proclaimed its "read[iness] and eager[ness] to try this case," ECF 110, Ex. A at 192— while *Chevron* itself was pending in the Supreme Court—Chevron litigated this case to the hilt on the merits, even urging the state court to

enter *its own proposed final judgment* after the jury's verdict. *Cf. Robertson*, 831 F.3d at 761 ("[A] defendant may constructively waive the right to remove by taking substantial action in state court that manifests a willingness to litigate on the merits."). Similarly, Atlantic Richfield engaged in all the same pre-trial conduct and specifically (though ultimately unsuccessfully) sought the state court's favorable *judgment* on Atlantic Richfield's liability—and then Atlantic Richfield successfully sought *its own separate state trial*.[8]

This is a quintessential case of defendants waiving their removal arguments by "'invok[ing] the jurisdiction of the state court in resolving the issues presented by the original complaint.'" *Abraham Watkins*, 155 F.4th at 460 (citation omitted). That this waiver occurred after an alleged "timely" removal does not change this fact. *See Brown*, 792 F.2d at 481. If the rule were otherwise, then a defendant always could keep one foot in federal court while "experiment[ing] on his case in the State court"— and if he does not like the results, then he can try to "stop the

---

[8] Notably, even if Atlantic Richfield had not vigorously invoked the state court's processes, a non-waiver finding as to Atlantic Richfield would be immaterial here because Appellants have based their removal efforts solely on the viability of *Chevron's* claim to federal-officer removal, *see* Br.4–7 (focusing only on "Chevron's WWII-era predecessor The Texas Company")—and Chevron's state-court litigation conduct constitutes a quintessential waiver.

17

proceedings, and take his suit to another tribunal." *Meyer v. Delaware R. Constr. Co.*, 100 U.S. 457, 473 (1879). That is not, and cannot be, the law. Accordingly, on remand to the district court, the State will ask that court to review Appellants' post-remand litigation conduct and hold that they have waived their removal arguments.

It is surprising to see Chevron separately represent (ECF 217 at 12) that "[a]ny litigation that has proceeded in state court has occurred over Defendants' objection." It is even more surprising to see Chevron try to shift the blame to this Court for its waiver, claiming that Chevron "w[as] forced to proceed in state court when this Court decided that Defendants were not entitled to have [a separate] remand order stayed pending appeal." ECF 217 at 15 (citing *Plaquemines Par.*, 84 F.4th at 373–75).

That is demonstrably untrue in at least two respects. *First*, when Chevron notified the state court about its Supreme Court case, it *did not object* to proceeding to trial; to the contrary, it stated that it remained "ready and eager to try this case." ECF 110, Ex. A at 192. *Second*, this Court had previously told Chevron to return to this Court with "an emergency motion to reinstate the stay" of the remand order if "the case will reach trial before our court rules on defendants' appeal."

*Plaquemines Par.*, 84 F.4th at 376. Chevron refused—never asking the state court to stop the trial and never returning to the district court or this Court before trial, during trial, or after trial (until the recent proceedings initiated after *Chevron II*). The conduct and representations speak for themselves.

**B.    Appellants' New "Acting Under" Theory Is Meritless.**

Turning to the merits, the State principally will focus its remand arguments on one issue the district court expressly left open—whether Appellants satisfy the "acting under" element of the federal-officer removal statute. *See* ROA.36333 n.48 ("[T]he Court will assume, without holding, that the Removing Defendants established the second element— that they acted under a federal officer's directive because they contracted with the government to refine crude oil."). They do not, for at least three reasons briefly raised here: (1) following a Ninth Circuit loss, Appellants are now foreclosed from asserting their new "acting under" theory based on avgas-refining contracts; (2) that new theory is not properly presented because Appellants did not preserve it in their removal petition; and (3) the theory fails on the merits because Appellants have never identified a federal "officer" under whom they purportedly acted and, in

all events, because the Ninth Circuit rightly determined that they failed to articulate an "acting under" relationship. The State will thus ask the district court to finally end this federal action on any of these grounds.

### 1. Collateral estoppel now forecloses Appellants' "acting under" theory.

On the merits, the State principally will argue on remand to the district court that Appellants' current removal efforts are foreclosed by collateral estoppel. They do not disclose that their parent companies lost their new "acting under" theory in the Ninth Circuit—in a judgment that subsequently resulted in a final remand order—while the appeal in this case was pending. The State will thus urge the district court that principles of collateral estoppel foreclose Appellants from raising the same "acting under" theory in this case.

a. Start with the Ninth Circuit litigation and loss. In *City of Oakland*, Chevron Corporation and BP p.l.c. (among other companies) faced state-court actions alleging that the companies' "production and promotion of fossil fuels is a public nuisance under California law." 2023 WL 8179286, at *1. As here, Chevron and BP sought to remove those suits to federal court on various grounds, including the federal-officer removal statute. *Id.* at *2. As the Ninth Circuit recounted, the companies

20

claimed to satisfy the statute because "they were acting under federal direction during World War II." *Id.* In particular, the companies "rel[ied]" on the argument that, "[b]ecause avgas was critical to the war effort" and "the United States government exercised significant control over the means of its production during World War II," they were acting under a federal officer in fulfilling their avgas contracts. *City of Oakland*, 2022 WL 14151421, at *7 (citation omitted). They relied on an "extensive record of their activities regarding the Second World War," including a "focus on the 'nature and extent of federal control exerted through agencies such as the Petroleum Administration for War (PAW).'" *Id.*[9]

But the companies lost that argument in both the California district court and the Ninth Circuit. The district court rejected that argument, citing the companies' own reliance on the PAW history: The PAW "so far as possible [] relied on the cooperation of the industry rather than on

---

[9] Consider Chevron and BP's own words in the Ninth Circuit. *See City of Oakland v. B.P. P.L.C.*, No. 22-16810 (9th Cir.), ECF 51 at 17 (claiming "to satisfy the 'acting under' requirement" on the grounds that "as part of the war effort, the federal government entered into contracts with Defendants' affiliates or predecessors to obtain 'vast quantities of avgas,' which 'was essential to the United States' war effort'" and that "[t]he contracts 'required' 'best efforts' 'to expand avgas production facilities' 'as quickly as possible'"); *see also id.* ECF 30 at 27–34 (extensively arguing that the avgas refining contracts established that "Defendants acted under federal officers during World War II").

orders and directives." *Id.* (citation omitted). Further, the PAW and other agencies "relied almost exclusively on contractual agreements to ensure avgas production." *Id.* (citation omitted). That contractual relationship does not suffice because "a private person 'is not acting under a federal officer when the person enters an arm's-length business arrangement with the federal government or supplies it with widely available commercial products or services.'" *Id.* (quotation marks omitted).

Affirming the district court in the companies' appeal on November 27, 2023, the Ninth Circuit likewise concluded that, "[a]s to the World War II claims, the evidence supplied by the Energy Companies merely confirms their compliance with the law while executing arms-length business agreements to supply fuel and build fuel infrastructure." 2023 WL 8179286, at *2. Indeed, because "'arm's-length business arrangement[s]' [] fail to support an 'acting under' relationship," "the Energy Companies were not 'acting under' federal officers." *Id.*

Following the Ninth Circuit's judgment, the California federal district court clerk transmitted the required remand notice to the California state court on February 16, 2024—ending the federal action shortly before this Court's now-vacated May 2024 decision in

*Plaquemines Parish v. BP America Production Co. (Chevron I)*, 103 F.4th 324 (5th Cir. 2024). *See The People of the State of Ca. v. BP P.L.C.*, No. 17-CV-6011 (N.D. Cal.), ECF 445.

b. As the State will show the district court, that loss forecloses Appellants from raising the same "acting under" theory here.

For purposes of determining whether collateral estoppel is implicated, "the party against whom the collateral estoppel would be applied generally must either have been a party, or privy to a party, in the prior litigation." *Vines v. Univ. of La. at Monroe*, 398 F.3d 700, 705 (5th Cir. 2005); *accord, e.g.*, *Robin Singh Educ. Servs. Inc. v. Excel Test Prep Inc.*, 274 F. App'x 399, 400 n.1 (5th Cir. 2008) (per curiam) ("Collateral estoppel would still apply because there is privity."). A parent company and its wholly owned subsidiary commonly are deemed to be in privity. *See, e.g.*, *Jose v. United Eng'rs & Constructors, Inc.*, 1994 WL 708774, at *2 n.1 (5th Cir. Nov. 30, 1994) (per curiam); *Astron Indus. Assocs., Inc. v. Chrysler Motors Corp.*, 405 F.2d 958, 961 (5th Cir. 1968). And that privity requirement is met here: Chevron Corporation (a defendant in *City of Oakland*) wholly owns Chevron U.S.A. Inc., Chevron U.S.A. Holdings Inc., and The Texas Company (defendants here), while

BP p.l.c. (a defendant in *City of Oakland*) wholly owns Atlantic Richfield Company (defendant here). Br.vi.[10] Because their parents controlled the *City of Oakland* arguments, therefore, Appellants are bound by estoppel principles here if they otherwise apply—and they do.

"Federal law determines the preclusive effect of a prior federal judgment." *Agrilectric Power Partners, Ltd. v. Gen. Elec. Co.*, 20 F.3d 663, 664 (5th Cir. 1994). "Collateral estoppel is appropriate where four conditions are met: (i) The issue under consideration in a subsequent action must be identical to the issue litigated in a prior action; (ii) The issue must have been fully and vigorously litigated in the prior action; (iii) The issue must have been necessary to support the judgment in the prior case; and (iv) There must be no special circumstance that would render [estoppel] inappropriate or unfair." *Kariuki v. Tarango*, 709 F.3d 495, 506 (5th Cir. 2013) (quotation marks omitted). "The fourth element, special circumstances rendering estoppel unfair, applies only to the use of offensive (non-mutual) collateral estoppel by the plaintiff." *Id.* As the

---

[10] Although Appellants cannot seriously dispute privity, if they *did* they would be raising "a factual question" appropriately left to the district court in the first instance. *See Astron Indus. Assocs., Inc.*, 405 F.2d at 961; *accord, e.g.*, *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 598–99 (5th Cir. 1985) (a district court's privity finding "is one of fact, to be reviewed under the 'clearly erroneous' standard").

State will urge the district court, each element is satisfied here.

*First*, Appellants' new "acting under" theory here is the same one they lost in *City of Oakland*. Here, as there, they argue that one defendant "satisfies the acting under requirement by virtue of its WWII-era contracts to supply the federal government with 100-octane avgas." Br.30 (cleaned up); *cf. City of Oakland*, No. 22-16810 (9th Cir.), ECF 30 at 30, 33 (citing their "[avgas] contracts" in arguing that "a private party acts under the government when the party is a contractor given detailed specifications and ongoing supervision to help fight a war" (citation omitted)). And here, as there, they argue that "a private party working under a federal contract to produce an item the government needed is the archetypal case of a defendant acting under a federal officer"—and one defendant "had just that type of acting under relationship: It was a federal contractor that refined a product—100-octane aviation gasoline (avgas)—that the government needed to fight and win the war." Br.30 (cleaned up); *cf. City of Oakland*, No. 22-16810 (9th Cir), ECF 30 at 28 (claiming that the federal government directed the refining of "100 octane aviation gasoline"), 33–34 (arguing that "Defendants' [avgas refining] activities under federal officers during World War II" satisfied the "acting

25

under" requirement because they gave the federal government "'a product that it used to help conduct a war' and 'that, in the absence of a contract with a private firm, the Government itself would have had to [produce]'").

*Second*, this issue was fully and vigorously litigated in *City of Oakland*. It was fully briefed and adjudicated in the district court. *See City of Oakland*, 2022 WL 14151421, at *7 (holding that, although "Defendants provide[d] an extensive record of their activities regarding the Second World War" and although "avgas was critical to the war effort," "a private person is not acting under a federal officer when the person enters into an arm's-length business arrangement with the federal government or supplies it with widely available commercial products or services" (quotation marks omitted)). And on the companies' appeal, the same issue was fully briefed and adjudicated in the Ninth Circuit. *See City of Oakland*, 2023 WL 8179286, at *2 ("As to the World War II claims, the evidence supplied by the Energy Companies merely confirms their compliance with the law while executing arms-length business agreements to supply fuel and build fuel infrastructure.").

*Third*, the *City of Oakland* courts' rejection of this theory was

necessary to support the final remand in that case. Had the companies prevailed on this theory on appeal, the February 2024 *City of Oakland* remand order could not have issued (assuming they satisfied the other removal requirements)—and the case would have remained in federal court. The companies' loss on this theory was thus necessary to the ultimate remand.

*Fourth*, and finally, there is no special circumstance that would render the application of estoppel unfair here. Chevron and BP are massive companies at the top of the Fortune 500—and they are supported by an army of the best law firms and counsel that money can buy. Susman Godfrey, LLP (Chevron's usual counsel and its counsel in *City of Oakland*) represents the Chevron entities here, and Arnold & Porter Kaye Scholer, LLP (BP's usual counsel and its counsel in *City of Oakland*) represents the BP entity (Atlantic Richfield) here. It is unsurprising, therefore, to see the same "acting under" theory across the companies' cases, notwithstanding the risk of an adverse determination that could impact all associated litigation. In fact, the "acting under" theory appears to have arisen for the first time in these Louisiana suits around the same time that Chevron and BP raised it in the *City of Oakland* litigation. All

to say that there is nothing unfair about holding Appellants to the consequences of their deeply strategic decisions.

More, that the rejection of Appellants' "acting under" theory was both reviewable *and* reviewed on appeal in *City of Oakland* underscores the fairness of applying estoppel here. "[A] remand order" that is "unappealable" generally is "not entitled to preclusive effect." *Neptune Shipmanagement Servs. PTE, Ltd. v. Dahiya*, 15 F.4th 630, 636 (5th Cir. 2021); *accord Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 395 (5th Cir. 1998) ("[I]t would seem appropriate to hold as a matter of law that collateral estoppel may not be applied offensively to a jurisdictional decision—such as one granting a motion to remand—that is not capable of being subjected to appellate review."). But this is not such a case because, as *City of Oakland* illustrates, remand orders rejecting federal-officer removal arguments *are* appealable. *See* 28 U.S.C. § 1446(d). And as this Court has explained, on the "continuum" of fairness in applying "offensive collateral estoppel," the "most fair" application is when "the losing party [had] ample opportunity and incentive to appeal" a dispositive issue. *Winters*, 149 F.3d at 395. Here, the companies in *City of Oakland* not only had that opportunity and

incentive to appeal—they *took* that opportunity to appeal, and they lost. This is the "most fair" application of estoppel, *id.*, the State will tell the district court.

### 2. The new "acting under" theory is not preserved.

Even if Appellants could avoid collateral estoppel, the State will urge the district court to reject the new "acting under" theory as inadequately preserved.

a. Appellants' removal notice—filed in 2018—has nothing to say about their argument today that they acted under a federal officer in fulfilling avgas refining contracts during World War II. This is incontestable, both as a matter of fact and as a matter of this Court's precedents.

Look first at the removal notice, which contains five pages under the heading "The federal government directed Defendants' activities." ROA.47-51. Neither those pages nor any other page in the notice mentions contracts or aviation gasoline (or avgas) or Appellants' purported refining conduct under the contracts. Instead, the removal notice's theory is that Appellants acted under federal officers in the "production of critically needed oil and gas"—upstream activities in the

field. ROA.50; *see id.* (emphasizing the alleged "issuance of more than 5000 federal directives closely governing exploration, production, transportation, conservation, manpower usage, construction, drilling, spacing, disposal, and general operations").

This Court thus has repeatedly recognized that this spate of removal notices focuses on whether the companies acted under federal officers "when they ramped up wartime oil production." *Plaquemines II*, 2022 WL 9914869, at *1. *Plaquemines II* foreclosed that theory, but in passing dicta, *Plaquemines II* suggested that a refinery that "had federal contracts and acted pursuant to those contracts" could potentially seek federal-officer removal. *Id.* at *4 (citation omitted). To be clear, no facts on the ground changed, nor did any law change; *Plaquemines II* simply suggested an idea that the companies had not raised—and that is what spawned this current "acting under" theory.

Again, this switching of horses is incontestable. As this Court has recounted, "[o]nly when defendants were unsuccessful in *Plaquemines II* did they construct the refinery argument, leading to additional jurisdictional litigation." *Plaquemines Par.*, 84 F.4th at 378. Put otherwise, once their original theory "was a lost cause"—having failed all

30

the way through a certiorari petition to the Supreme Court, *see Chevron USA Inc. v. Plaquemines Par., La.*, No. 22-715 (U.S.)—Appellants and their co-defendants "rallied to find a way to distinguish their cases from" that lost cause. *Plaquemines Par.*, 84 F.4th at 378 (citation omitted). "[H]ence a new refinery-based argument for federal officer removal was born." *Id.*

b. This litigation history is critical because it demonstrates that Appellants' new "acting under" theory is not adequately preserved below.

A defendant "waive[s] any argument related to [] jurisdiction by not invoking it in [the defendant's] notice[] of removal." *City of Oakland v. BP PLC*, 969 F.3d 895, 911 n.12 (9th Cir. 2020); *cf. E.T. v. Paxton*, 41 F.4th 709, 718 n.2 (5th Cir. 2022) ("arguments in favor of jurisdiction[] can be forfeited or waived" (citation omitted)). That is primarily because the general removal statute requires "a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). And while a defendant can freely amend his removal notice within the 30-day period permitted for filing the notice, *id.* § 1446(b); *City of Oakland*, 969 F.3d at 912 n.12, he cannot do so outside that window. Outside that window, a defendant may amend his notice (a) only through an affidavit and (b) only to "clarify (or

correct technical deficiencies in) the allegations already contained in the original notice." *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 206 n.12 (3d Cir. 2003) (citing, among other sources, *Willingham*, 395 U.S. at 407 n.3, and 28 U.S.C. § 1653); *see Wood*, 764 F.3d at 323 ("[A]fter thirty days, district courts have discretion to permit amendments that correct allegations already present in the notice of removal. Courts have no discretion to permit amendments furnishing new allegations of a jurisdictional basis.").

Here, Appellants' new theory does not clarify or correct a technical deficiency in the original notice; it is a new theory of jurisdiction altogether. As this Court put it, this is "a new refinery-based argument for federal officer removal [] born" out of Appellants' "lost cause" in the live removal notice. *Plaquemines Par.*, 84 F.4th at 378 (citation omitted). Thus, the new theory is squarely barred. *See, e.g.*, *Hinojosa v. Perez*, 214 F. Supp. 2d 703, 707 (S.D. Tex. 2002) ("It would be a substantial injustice to allow Defendants to remove a case on one ground and then, when faced with a serious challenge to that ground, attempt to justify removal on an entirely different, and untimely, ground.").

Sensing this problem, Appellants attempt to preempt it by insisting

that this Court has *already* "reject[ed] any timeliness objection" to their removal efforts in a prior case. *See* Br.28–29 (citing *Par. of Plaquemines v. Chevron USA, Inc.*, 7 F.4th 362 (5th Cir. 2021)). That is misdirection. It is true that the cited decision rejected a timeliness objection—but that was a timeliness objection to *the original theory* in the removal notice in that case (which materially mirrors the notice in this case). *See, e.g.*, 7 F.4th at 369 (citing Appellants' original "acting under" theory—that "the [challenged] production activities ... were directed by the federal government during World War II"). Neither this Court nor the district court has considered whether Appellants may raise their new avgas-refining-contract theory despite failing to assert it in the removal notice. And the State will urge the district court on remand that it has "no discretion" to consider that new theory. *Wood*, 764 F.3d at 323.

### 3. The alleged refining activities do not satisfy the "acting under" prong.

The State also will tell the district court that, if it reaches the merits of the new "acting under" theory, the theory has at least two substantial defects.

*First*, it fails to identify any federal "officer" under whom Appellants purportedly acted in fulfilling their avgas-refining contracts.

The federal-officer removal statute takes care to distinguish between actions against a United States "agency" and actions against an "officer" of the United States (or of one of its agencies) 28 U.S.C. § 1442(a)(1). And when it comes to the parenthetical authorizing the removal of actions against "any person acting under *that* officer," *id.* (emphasis added), that parenthetical plainly is centered on a particular officer, not a particular agency—*i.e.*, an officer "of the United States or of any agency thereof." *Id.* An "officer," in turn, is a natural person "who holds an office of trust, authority, or command." *Officer*, Black's Law Dictionary (12th ed. 2024). Indeed, "[i]n public affairs," the term "officer" especially refers "to a person holding public office under a national, state, or local government, and authorized by that government to exercise some specific function." *Id.*; *cf.* U.S. Const. art. II, § 2, cl. 2 (referring to "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States"). So merely claiming to have been acting under *a federal agency* does not suffice for purposes of federal-*officer* removal.

That is Appellants' problem here. They vaguely claim to have been carrying out their refining agreements pursuant to directives from "the

federal government" or "PAW." Br.5. But neither the federal government nor PAW is an officer. *See id.* (admitting PAW was an "agency"). And the contracting party in Appellants' cited avgas contracts generally was the Defense Supplies *Corporation*, ROA.34248 (cited at Br.6)—in other words, not "a person holding public office under a national, state, or local government, and authorized by that government to exercise some specific function," *Officer*, Black's Law Dictionary (12th ed. 2024).

Having failed to identify the most basic element of the "acting under" prong—that they acted under *an officer* in fulfilling avgas-refining contracts—Appellants' new "acting theory" does not get off the ground. And that is critical because, if there is no relevant officer in sight, there is no legal basis to conduct the remainder of the analysis into whether the refining activities qualify as "acting under" conduct.

*Second*, setting aside that threshold problem, the Ninth Circuit was exactly right to hold that these contract-based refining activities fail to satisfy the "acting under" element. The Supreme Court has left open the question "whether and when particular circumstances may enable private contractors to invoke the [federal-officer removal] statute." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 154 (2007). At the same time,

however, the Court has established that even "a highly regulated" company's "compliance (or noncompliance) with federal laws rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'" *Id.* at 153; *see id.* ("[T]hat is so ... even if the private firms' activities are highly supervised and monitored."). Rather, the defendant "typically" must be under the "'subjection, guidance, or control'" of the officer, and "involve[d] [in] an effort to *assist, or to help carry out*, the duties or tasks of the federal superior." *Id.* at 151–52.

The question presented in this case is where Appellants' alleged refining of avgas pursuant to federal contracts falls along this continuum. The closest case on point is this Court's decision in *Winters*. There, this Court found an "acting under" relationship where the federal government "contracted with [] chemical companies for a specific mixture of herbicides, which eventually became known as Agent Orange" and which was "never manufactured or registered ... for domestic use either prior to or after making 'Agent Orange' for the Government." *Winters*, 149 F.3d at 398–99. Not only did the federal government exercise "direct control ... over the composition and production of Agent Orange," but this

Court emphasized also that the chemical companies "were compelled to deliver Agent Orange to the government under threat of criminal sanctions," and the government supervised "the formulation, packaging, and delivery of Agent Orange." *Id.* at 398, 400; *see id.* at 399 (recounting the chemical specifications). For these reasons, this Court found an "acting under" relationship and rejected an argument that "the government bought Agent Orange as an 'off-the-shelf' product,'" which, the Court suggested, might present a different case. *Id.* at 399–400.

This is that different case, as the Ninth Circuit and California district court concluded. Unlike the demand for Agent Orange on pain of criminal sanctions in *Winters*, the federal government's procurement of avgas during World War II generally "relied on the cooperation of the industry rather than on orders and directives." *City of Oakland*, 2022 WL 14151421, at *7 (citation omitted). Unlike Agent Orange, avgas was (and continues to be) manufactured and sold for domestic use both during and after World War II. And unlike the federal government's dialing in of the specific chemical properties comprising Agent Orange, the cited avgas contracts here call for, well, ordinary avgas (typically 100-Octane). ROA.34267 (cited at Br.6).

As these distinctions reveal, this case presents the "off-the-shelf" product scenario that the *Winters* plaintiff unsuccessfully sought to make that case out to present. 149 F.3d at 399. Or, as the Ninth Circuit put it, "the evidence supplied by the Energy Companies merely confirms their compliance with the law while executing arms-length business agreements to supply fuel and build fuel infrastructure." *City of Oakland*, 2023 WL 8179286, at *2. And "'arm's-length business arrangement[s]' [] fail to support an 'acting under' relationship." *Id.*; *see City of Oakland*, 2022 WL 14151421, at *7 ("[A] private person 'is not acting under a federal officer when the person enters an arm's-length business arrangement with the federal government or supplies it with widely available commercial products or services.'" (quotation marks omitted)).

That Appellants do not disclose their Ninth Circuit loss on these precise grounds is striking. Instead, they rely (Br.30) on the now-vacated *Chevron I* decision, which concluded in a single paragraph that the avgas-refining contracts created the requisite "acting under" relationship. *See* 103 F.4th at 334–35. But Appellants obscure two key reasons why that reliance is misplaced.

One, that now-vacated decision has no precedential significance

and thus does not bind this panel or the district court on remand. *See, e.g.*, *Bennett v. W. Tex. State Univ.*, 799 F.2d 155, 159 n.3 (5th Cir. 1986) ("[T]he decision by the Supreme Court to vacate [a Fifth Circuit decision] eliminates any precedential value it might have."); *accord Central Pines Land Co. v. United States*, 274 F.3d 881, 893 n.57 (5th Cir. 2001); *contra* Br.31 (citing out-of-circuit precedent to suggest a contrary rule).

Two, the parties in *Chevron I* did not squarely brief this issue because of how the district courts in that litigation teed up the appeal: Those courts assumed without deciding that the refinery contracts ordinarily would satisfy "acting under" prong, but held that the refining activities could not be considered the relevant "acting under" conduct because these lawsuits do not challenge refining activities. *See Par. of Plaquemines v. Northcoast Oil Co.*, 669 F. Supp. 3d 584, 595 (E.D. La. 2023) ("The Court will assume that in light of the federal contract, Gulf was acting under a federal officer to produce military petroleum products at its refinery in Port Arthur, Texas during World War II."). Accordingly, in both the Fifth Circuit and the Supreme Court, the briefing and arguments were built on the assumption (introduced by the district courts) that the refining contracts would otherwise satisfy the "acting"

under" element *if* (as the Supreme Court later held) refining activities could be considered. *See* Br.30 (noting the Supreme Court's unremarkable observation of this point); *Chevron II*, 146 S. Ct. at 1060 n.2 (similarly "assum[ing], without deciding" the "acting under" element could be satisfied through the contracts).

Had the issue been squarely presented on appeal in *Chevron*, the State would have run the above arguments—but instead, the Fifth Circuit *Chevron* panel wrote its paragraph on this issue without the benefit of exhaustive adversarial briefing. That issue now has come to a head, and as shown above, Appellants will lose their new "acting under" refinery argument either procedurally or on the merits.

## C.   Appellants Have No Colorable Federal Defense.

Last, in determining that it "need not address the other elements" of removal (*i.e.*, other than the "related to" element), ROA.36333 n.48, the district court left open the question whether Appellants have identified a colorable federal defense. The Supreme Court has long imposed "the requirement that federal officer removal must be predicated on the allegation of a colorable federal defense." *Mesa*, 489 U.S. at 129. And on remand, the State will argue before the district court that Appellants

have not satisfied that requirement.

In their briefing today, Appellants identify only two allegedly colorable defenses: preemption and due process. That is remarkable because Appellants do not acknowledge that both alleged defenses are foreclosed. And in any event, they all but concede that these alleged defenses do not cover their supposed "acting under" refining conduct, as required by *Mesa* and related cases.

### 1. The preemption defense is waived.

Take the alleged preemption defense first. By Appellants' telling, they have a "'clearly' colorable" preemption defense that "is far more than just colorable; it is meritorious." Br.34–35; *see id.* at 36–37 (identifying allegedly conflicting federal regulations). But we do not have to guess about the colorability of this defense, because Chevron already has gone to trial to litigate its liability, and we have a jury verdict. *See In re Blackwater Sec. Consulting, LLC*, 460 F.3d 576, 589 (4th Cir. 2006) ("[R]emanding despite a potential federal defense does not hamstring the litigation of that defense in state court."). Oddly, Appellants do not disclose how this preemption defense fared at trial. That appears to be because—so far as the State can tell—Chevron did not press the

preemption defense. Again, so far as the State can tell, it appears nowhere in the rough trial transcript or Chevron's proposed jury instructions (or objections to the instructions issued). *See* ECF 203-4 at 30–34 (Chevron's proposed instructions including affirmative defenses but not preemption).

Under both federal law and Louisiana law, Chevron's apparent failure to press its preemption defense constitutes a waiver of that defense. *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) ("Defenses not raised or argued at trial are ordinarily waived by the parties failing to raise them."); *Naghi v. Europe's Finest, Inc.*, 114 F. App'x 606, 608 (5th Cir. 2004) (per curiam) (affirmative defense "is waived if not raised at trial"); *Stephens v. C.I.T. Grp./Equip. Financing, Inc.*, 955 F.2d 1023, 1026 (5th Cir. 1992) (same); *see also, e.g.*, *State v. Wilcox*, 2009 WL 5647218, at *6 n.6 (La. App. Dec. 23, 2009) (under Louisiana law, "[b]y failing to request a charge on [an] affirmative defense, the defendant waive[s] it"); *Shephard v. AIX Energy, Inc.*, 249 So. 3d 194, 217 (La. App. 2018) ("The affirmative defense must be specially pled in the answer and proved at trial. Failure to do so constitutes waiver." (citations omitted)).

That waiver matters because, if (as the State will urge the district court) this case will continue in state court as it has for years, then there is no preserved preemption defense. And even if the case were removed to the federal court at this eleventh hour, again there is no preserved preemption defense. That is because, "[i]n this circuit, when a case is removed from state court to federal court, the federal court takes the case as it finds it and treats the state court rulings as its own." *In re Alabama & Dunlavy, Ltd.*, 983 F.3d 766, 773 (5th Cir. 2020) (citing *In re Meyerland Co.*, 960 F.2d 512, 520 (5th Cir. 1992) (en banc), in turn citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 435–36 (1974)). So the waived-in-state-court preemption defense would be just as waived in federal court.

All this is to say that, having waived a particular defense in this exact case *before* a federal court even adjudicated the colorable-federal-defense requirement, Appellants cannot resurrect the same defense to try to secure removal.[11] Put otherwise, the point of federal-officer removal is to ensure that a colorable federal defense may be "tried in a federal

---

[11] Here, too, even if Atlantic Richfield could escape Chevron's waiver, that would not change the outcome of this removal litigation because Appellants rest only on allegations regarding Chevron's alleged entitlement to removal. *See supra* n.8.

court," *Mesa*, 489 U.S. at 133 (citation omitted)—but that is a moot point where, as here, no such defense could be tried in federal court (even if the case were otherwise removeable).

Chevron surely had strategic reasons for tabling the preemption defense in this high-stakes litigation—perhaps because it clearly fails on the merits or is irrelevant, as the State will explain to the district court. But whatever the reason, there is no question that Appellants cannot rely on supposed preemption to secure federal-officer removal.

### 2. The due process defense is unpreserved and, in any event, unreviewable in this posture.

Things are even worse for Appellants on their alleged due process defense. They do not disclose that they have not actually preserved this argument in federal court. Nor do they disclose that they have already *lost* this due process argument in state court, which prevents them from commandeering this removal proceeding to collaterally attack their state-court loss.

a. Start with the obvious preservation problems. "[I]t is the raising of a federal question *in the [] removal petition* that constitutes the federal law under which the action against the [person acting under a] federal officer arises for Art. III purposes." *Mesa*, 489 U.S. at 136 (emphasis

44

added). If a defendant seeking removal thus "fail[s] to assert [a] specific defense ... when it remove[s] the action," that defendant "cannot [subsequently] rely on" that defense in trying to prove up the elements of federal-officer removal under § 1442(a). *Wood*, 764 F.3d at 324; *see id.* at 324–25 (rejecting reliance on a defense "that was never adequately asserted in the first place").

That is Appellants' principal preservation problem here. Their removal notice asserts three alleged federal defenses: (i) they "are entitled to government immunity"; (ii) "federal law preempts the relief Plaintiffs seek"; and (iii) their "activities prior to the enactment of SLCRMA were carried out in compliance with applicable federal statutes, regulations and orders and [] Defendants therefore cannot be held liable under SLCRMA[.]" ROA.54-56. It never once mentions due process, much less makes the argument Appellants now raise in this federal proceeding. *See* Br.37–38 (claiming Appellants "have strong due process defenses," including a lack of "fair notice" about the applicability of state law). Because they are now urging a defense "that was never adequately asserted in the first place" (or asserted at all) in the removal notice, they cannot rely on it now. *See Wood*, 764 F.3d at 324–25.

For the sake of completeness, it bears noting that the preservation problems run deeper still. In the district court below, "due process" appears all of one time in Appellants' remand opposition. *See* ROA.31677 ("The removing Defendants have raised federal defenses based on (1) immunity, (2) preemption, (3) due process, and (4) failure to exhaust administrative remedies."). The citation for that sentence is not the removal notice but Appellants' briefing in *another* case—and in that briefing, due process appears out of thin air, without a citation of the removal notice (because the defense was not preserved there either). *See Plaquemines Par. v. Riverwood Prod. Co., Inc.*, No. 18-CV-5217 (E.D. La.), ECF 47 at 25, ECF 104 at 25. On remand to the district court, therefore, the State will advise that court that this due process argument is unpreserved twice over: both because it is not in the removal notice and because Appellants cannot piggyback on an unpreserved argument in another case.

b. All this says nothing of Appellants' actual *loss* on this due process argument in state court—which independently forecloses removal on this basis. Both Chevron and Atlantic Richfield filed motions for summary judgment on this due process argument, which the state court denied.

46

ECF 203-2; Judgment, *Par. of Plaquemines v. Rozel Operating Co.*, No. 60-996 (25th Jud. Dist. Ct., Par. of Plaquemines Feb. 10, 2025). Chevron also unsuccessfully sought a directed verdict on due process grounds. *See* Docket, *Par. of Plaquemines v. Rozel Operating Co.*, No. 60-996 (25th Jud. Dist. Ct., Par. of Plaquemines) (Mar. 25, 2025 filings). And although the rough trial transcript is not lodged with the state court, that transcript reveals the state court's thorough rejection of the due process issue.

Appellants' loss independently forecloses their ability to invoke due process as a basis for removal. That they do not acknowledge their loss, let alone try to overcome the state court's reasons for rejecting their due process argument, is the best evidence that the argument is not colorable. A federal-officer defendant "need not win his case before he can have it removed," *Willingham*, 395 U.S. at 407, but, by the same token, a defendant who already has *lost* his defense on the merits before he can secure removal cannot plausibly claim his defense is colorable. *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 297 n.10 (5th Cir. 2020) (cautioning courts only to "avoid [a] *premature* merits determination" (emphasis added)).

To be sure, Appellants presumably disagree with their merits loss

47

on due process. But that is a consequence of their strategic choice to litigate the merits in state court. And they are not without recourse: They may file a proper post-trial motion or a proper merits appeal to seek to overturn that loss. But they cannot commandeer this removal proceeding to collaterally attack a state-court loss that they knowingly incurred.

One final note on procedure: As discussed above, even if this case could be removed to federal court (a second time), the district court would "take[] the case as it finds it and treat[] the state court rulings as its own." *In re Alabama & Dunlavy, Ltd.*, 983 F.3d at 773. So Appellants' due process loss would come into federal court as it is—which means the district court would be deemed to have rejected the due process argument as a matter of law. That would logically foreclose any suggestion that the due process argument is "colorable." Thus knowing that fact, the district court cannot say the due process argument is colorable. The State will make that argument below, in addition to contesting the merits of the due process issue as necessary.

### 3. In all events, neither defense addresses the refining conduct allegedly under color of federal office.

Even if Appellants had live defenses, those defenses would be

legally insufficient because they do not address the conduct under color of federal office.

a. The textual point in this respect is straightforward. The plain text of 28 U.S.C. § 1442(a), of course, does not use the words "colorable federal defense." In *Mesa*, however, the Supreme Court held that the phrase "under color of office" *does* "bear the weight of a federal defense requirement." 489 U.S. at 134; *see* § 1442(a)(1) (current version of the statute permitting the removal of "[a] civil action ... against ... any person acting under [a federal] officer ... for or relating to any act under color of such office"). Indeed, it is that textual hook that assures "the raising of a federal question in the officer's removal petition," which, in turn, establishes Article III jurisdiction. *Mesa*, 489 U.S. at 136.

The Supreme Court's homing of the colorable-federal-defense requirement in the phrase "under color of [such] office" establishes a significant textual point: The preposition "under" is attached to the noun "act" ("act under color of such office")—which itself is a reference back to the defendant's "act[ing] under [a federal] officer." § 1442(a)(1). On Appellants' new "acting under" theory of the case, we know the relevant "act under color of such office": that "Chevron 'act[ed] under' federal

officers when it performed its refining duties." *Chevron*, 146 S. Ct. at 1057. To borrow the statutory terms, Appellants' theory is that the relevant "act[s] under color of such office" are the performance of the alleged refining activities. § 1442(a)(1).

That textual point is significant because it means that, for purposes of this case, the alleged refining activities (the "act[s] under color of such office") "bear the weight of [the] federal defense requirement." *Mesa*, 489 U.S. at 134. And therein lies the problem: Appellants all but admit that their claimed preemption and due process defenses have nothing to do with the alleged refining activities. *See* Br.39 (protesting that "[n]either the Constitution nor the statute requires the federal issue to arise out of the defendants' official duties"). If anything, those defenses go instead to Appellants' upstream production activities in the field, like crude production. *See* Br.36–38; Br.41 (effectively conceding that "Defendants' colorable federal preemption defense addresses conflicting state and federal rules for crude production rather than conflicting state and federal rules for avgas refining"). But that does not work under the statute because those are the wrong acts for present purposes.

On Appellants' new "acting under" theory, their challenged

*upstream* production activities concededly "were not done under color of [federal] office"—but, they say, that is not fatal because "the suits 'relat[e] to' [] acts" under color of federal office (*i.e.*, the *downstream* refining activities). *Chevron*, 146 S. Ct. at 1063. *Mesa* thus places the weight of the colorable-federal-defense requirement on Appellants' ability to produce a federal question as to the refining activities, not the production activities—and they cannot.

b. Anticipating this problem, Appellants deride (Br.38) the colorable-federal-defense requirement as "an atextual requirement" ungrounded in § 1442(a). That is incorrect. This was the whole point of *Mesa*: whether the statutory phrase "'under color of [federal] office' [could] bear the weight of a federal defense requirement." 489 U.S. at 134. It could, the Supreme Court concluded, because Congress used the "expression[]" "under color of [federal] office" "to preserve the pre-existing requirement of a federal defense for removal." *Id.* at 135. Contrary to Appellants' position, therefore, the colorable-federal-defense requirement is *textual* and it is found in the phrase "under color of [federal] office."

Next, Appellants argue (Br.38–39) that, because establishing

Article III jurisdiction is the real aim, "any" free-floating colorable federal defense in the removal notice "can serve that purpose." That is wrong for two reasons. *First*, it asks this Court to underrule *Mesa* by untethering the colorable-federal-defense requirement from the textual phrase "under color of [federal] office." That alone is the Supreme Court's prerogative. *Agostini v. Felton*, 521 U.S. 203, 237–38 (1997); *accord Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 345–46 (5th Cir. 2024). *Second*, Appellants' argument is ardently anti-textualist. *Mesa*'s virtue is it found a plausible textual home ("under color of [federal] office") for the colorable-federal-defense requirement—a home that necessarily circumscribes the requirement as explained above. But the vice of Appellants' argument is it would superimpose the requirement on the statute without any other plausible textual basis at all.

Appellants also portray (Br.40–41) the State as relitigating a loss in *Chevron II* and attempting to nullify Congress's 2011 amendments to the federal-officer removal statute. Neither portrayal is accurate. As the Supreme Court made clear, it did not decide any issue related to "the other requirements of federal officer removal," *Chevron II*, 146 S. Ct.at 1062 n.5, including the colorable-federal-defense requirement. As for the

2011 amendments, Congress did *not* amend the key phrase central to *Mesa*—"act under color of such office." Appellants thus cannot claim that the 2011 amendments somehow give lower courts license to ignore *Mesa*.

Finally, embracing the causal-nexus requirement they fought so hard to defeat, they claim that their production-related defenses (not under color of federal office) are "closely connected" enough to their refining activities (allegedly under color of federal office) such that they should be permitted to mix-and-match defenses. Br.41. Notably, they do not attempt to reconcile that argument with *Mesa*'s textual holding: that the colorable defense must run to the act under color of federal office. For that reason and the others above, the State will ask the district court on remand to independently and finally foreclose removal for lack of a colorable federal defense.

## III. THE COURT SHOULD DECLINE TO FACILITATE APPELLANTS' GAMESMANSHIP.

Given the overwhelming number of open issues, there is no serious question about the proper disposition of this appeal—it is the one ordered by Judges Davis, Engelhardt, and Oldham on remand from the Supreme Court: "[W]e REMAND the case[] to the [] district court[] for proceedings consistent with the Supreme Court's opinion" in *Chevron*. *Chevron III*,

2026 WL 1449936, at \*1. After all, this Court "sits as a court of review, not of first view." *Sentry Ins.*, 101 F.4th at 399 (citation omitted).

Nonetheless, over the past couple of months, Appellants have launched a flurry of desperate measures aimed at trying to enjoin and void the very state trial proceedings that Chevron "read[ily] and eager[ly]" embraced, ECF 110, Ex. A at 192—even as *Chevron* was pending in the Supreme Court. Those measures so far have failed. Yet Appellants continue to demand faster action from this Court, attempting to enlist the Court in their effort to correct their strategic mistakes in state court. Most prominent now is their demand that the Court issue a "ruling no later than September 2, 2026, because (absent prompt action by this Court) the state court appears poised to enter final judgment on September 3." Br.42. (They leave out that the September 3 hearing scheduled by the state court is related to *Chevron's own motion for entry of final judgment*.)

These ongoing efforts reek of hostility to the well-respected state trial judge who has simply conducted the proceedings that Chevron said it was "ready and eager" to complete. ECF 110, Ex. A at 192. They directly offend our federalism insofar as they seek to supersede state-court

proceedings that are expressly protected by statute. And they suggest that this Court can (and should) play a role in destroying the comity demanded by our constitutional structure.

To be clear, for all the reasons explained above, *see supra* Section II, Appellants will not succeed in their removal efforts. Out of an abundance of caution, however, the State is obligated to identify for this Court—as it will for the district court—three critical misimpressions in these efforts that warrant careful avoidance in closing out this federal action.

*First*, in the same breath that Chevron told the state court it was ready and eager to try this case, Chevron told the court that its ultimate judgment might be "void" if a federal court subsequently believed the case should not have been remanded to state court. *Id.* Appellants repeated that belief in a submission to this Court. ECF 113 at 10 ("once removal occurs, 'any post-removal proceedings in the state are considered coram non judice and will be vacated by the federal court'" (citing Wright & Miller, 14C Fed. Prac. & Proc. § 3736 (4th ed. 2026))).

That is incorrect. As discussed above, this Court's precedents hold that a district court would "take[] the case as it finds it and treats the

55

state court rulings as its own." *In re Alabama & Dunlavy, Ltd.*, 983 F.3d at 773. Indeed, even where a state court already has entered judgment, "the district court should simply 'take the state judgment as it finds it, prepare the record as required for appeal, and forward the case to the appellate court for review.'" *Id.* (quoting *In re Meyerland Co.*, 960 F.2d at 520).

Appellants cited Wright & Miller to try to get around that squarely binding precedent, but misrepresented Wright & Miller. When that treatise says that "any post-removal proceedings in the state court are considered coram non judice and will be vacated by the federal court," it is referring to a situation where a case has been removed *and not remanded*. That is the plain import of the general removal statute, which provides that, "after the removal of a civil case is effected, 'the State court shall proceed no further unless and until the case is remanded.'" Wright & Miller, 14C Fed. Prac. & Proc. § 3736 (4th ed. 2026) (citing 28 U.S.C. § 1446(d)). Any state court action in the interim, therefore, is void. But that is not true where, as here, the federal court *has remanded* the case to the state court after removal. In this context, § 1446(d) itself permits the state court to proceed (because "the case is remanded"), and § 1447(c)

says so expressly: "The State court may thereupon proceed with such case" after it receives "[a] certified copy of the order of remand."

That is what happened here—and so, there is no question that the black-letter principles from *In re Alabama & Dunlavy* would control if (hypothetically) a federal court thought the October 2023 remand was not warranted. The relevant takeaway, therefore, is that there is nothing to Appellants' inuendo suggesting that removal, if ordered, would take us back to Genesis.

*Second*, Appellants' briefing and arguments also suggest that there would be something magical about the (hypothetical) moment this Court reversed a remand order. In particular, they suggest that state-court proceedings would immediately grind to a halt and jurisdiction would transfer again to federal court. Of course, that issue is far from ripe here (and in the State's view will never be ripe). But it bears noting that Appellants are wrong. The First Circuit's decision in *Forty Six Hundred LLC v. Cadence Education, LLC*, 15 F.4th 70 (1st Cir. 2021), is one of the few available cases addressing the unique situation where a remand order is reversed on appeal after state court proceedings have resumed. In that case, the state-court proceedings were "uneventful" and "still in

their early stages." *Id.* at 79–80. The First Circuit thus saw no reason that "general considerations of comity [should] override [the defendant's] entitlement to a federal forum." *Id.* at 79. And so the First Circuit relied on "general principles of comity, cooperation, and communication between state and federal courts" to simply express "confiden[ce] that the district court can enlist the state court's cooperation and restore the action to its own docket[.]" *Id.* at 80–81.

For reasons already discussed, *see supra* Section II.A, those principles plainly would play out differently here if a federal court believed the October 2023 remand to state court was erroneous. Far from being uneventful and in their early stages, the state court proceedings are virtually complete—a product of Chevron's eagerness, no less. General considerations of comity, therefore, would counsel against removal altogether. *Cf. Caterpillar Inc. v. Lewis*, 519 U.S. 61, 75–77 (1996) (where a case is improperly removed but there is no jurisdictional defect, the federal court's judgment should not be disturbed since "considerations of finality, efficiency, and economy become overwhelming"). And at the very least, the federal courts likely would benefit from the state court closing all pending motions, entering final

judgment, and sending the federal courts a tidy package. To be clear (again), this removal effort will not succeed—but the State must put the lie to misimpressions about what lurks behind the door of removal.

*Third*, Appellants tried to bait both the district court and the motions panel into effectively enjoining the state trial court from continuing proceedings. Neither court took the bait. For good reason: That sort of injunction is squarely barred by the Anti-Injunction Act, 28 U.S.C. § 2283 (generally prohibiting federal courts from "grant[ing] an injunction to stay proceedings in a State court"). Appellants did not dispute that the Act would bar such an injunction if the Act applies. Nor could they: That Congress affirmatively *protected* the state trial court's ability to continue trial proceedings upon remand, *see* § 1447(c), means that the removal statute and the Act combine to bar an injunction against such proceedings.

Rather than dispute the issue, Appellants tried to sidestep it altogether by claiming that they were seeking only an innocent stay of the district court's October 2023 remand order. ECF 113 at 5 (citing cases where the issue of ongoing state-court proceedings was not presented). Setting aside the absurdity of "staying" a remand order years after the

fact—and after years of state trial proceedings—this was obfuscation: Appellants' stated objective was to bar any "further proceedings ... in state court" and "to ensure that the state court will not proceed further in this case." ECF 92 at 16, 17, 19, 21. And of course, that is squarely prohibited by both the Anti-Injunction Act and the removal statute. Thankfully, neither federal court took that federalism-destroying step.

The State raises this issue because Appellants' demand for expedited argument and their opening brief continue to heavily imply that this Court must act expeditiously to thwart state-court proceedings. Insofar as Appellants seek an injunction against state-court proceedings or an in terrorem effect scaring the state court into enjoining itself, that is highly improper and the Court should decline. *Cf. Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly what she is barred from doing directly[.]").

## CONCLUSION

The Court should "REMAND the case[] to the [] district court[] for proceedings consistent with the Supreme Court's opinion" in *Chevron*. *See Chevron III*, 2026 WL 1449936, at *1.

Dated: July 21, 2026

Respectfully submitted,

<table>
<tr><td>J. Blake Canfield<br>  Executive Counsel<br>LOUISIANA DEPARTMENT<br>  OF ENERGY AND<br>  NATURAL RESOURCES<br>617 N. Third St.<br>Baton Rouge, LA 70802</td><td>LIZ MURRILL<br>  ATTORNEY GENERAL<br>*/s/ J. Benjamin Aguiñaga*<br>J. Benjamin Aguiñaga<br>  Solicitor General<br>Kelsey L. Smith<br>  Deputy Solicitor General<br>OFFICE OF THE LOUISIANA<br>ATTORNEY GENERAL<br>1885 N. Third Street<br>Baton Rouge, LA 70802<br>Telephone: (225) 506-3746<br>AguinagaB@ag.louisiana.gov</td></tr>
</table>

**CERTIFICATE OF SERVICE**

I certify that on July 21, 2026, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this motion complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,768 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

Dated:   July 21, 2026